RAYNARD RUSKAMP ET AL., APPELLEES, v. HOG BUILDERS, INC., A CORPORATION, ET AL., APPELLANTS.
219 N. W. 2d 750

Filed June 27, 1974. No. 39317.

John R. Douglas of Cassem, Tierney, Adams & Henatsch, for appellants.

Marks, Clare, Hopkins, Rauth & Garber, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, NEWTON, CLINTON, and BRODKEY, JJ.

McCOWN, J.

This is an action for damages for breach of warranty in connection with the sale of 22 breeding gilts purchased by plaintiffs Ruskamp from one of the defendants, Hog Builders, Inc. The jury returned a verdict for the plaintiffs for $14,500. Defendants appeal.

The plaintiffs live on a farm near Dodge, Nebraska, and have raised hogs for 20 years. In January 1968, at the invitation of a representative of defendant, Hog

Builders, Inc., Mr. Ruskamp attended a sales meeting sponsored by the defendant to familiarize potential customers with its product. The defendant made a slide presentation promoting the hybrid hogs the defendant was offering for sale, which showed the conditions under which the hogs were produced. A question and answer period followed, during which Ruskamp asked if the defendant's hogs were free of rhinitis. He was assured that they were. Copies of the defendant's printed warranties were available at the meeting. There were express warranties that the animals will have been vaccinated for erysipelas and leptospirosis and that they will have passed a negative test for brucellosis and/or originate from defendant's brucellosis-free herd. Defendant's purchase order form also contained a provision that the written certificate of vaccination would also cover hog cholera. Neither the guarantee form nor the purchase order contained any disclaimer of other warranties nor any language which would exclude or modify any implied warranties of fitness.

In January 1968, Ruskamps purchased 2 boars and 12 gilts. The plaintiffs were fully satisfied with these animals. The gilts produced about 9 pigs per litter. On September 20, 1968, based on his previous experience, Ruskamp ordered 22 gilts, "just like the 12 that I ordered before." The purchase price was $90 each, plus $3 delivery, a total of $2,046.

The written guarantee and the purchase order form were the same as those on the previous order except that the words "hog cholera" were crossed out on the purchase order form. The gilts for plaintiff's first order in January had come from defendant's farm in Missouri. The gilts for the second order came from the Bobbie Larson farm in South Dakota, and were delivered at the Ruskamp farm on November 7, 1968. Ruskamp did not notice anything unusual about any of them while he was feeding the medicated feed during the 2 or 3 weeks before he turned them in with the

boars. Then during December 1968, he noticed that two of the gilts were turning runty. A couple of the gilts had nose bleeds. The two runty gilts and four others did not get impregnated. The other 16 gilts did. The 16 gilts that farrowed averaged 6 pigs each.

After the pigs were 2 weeks old, they started sneezing. They would rub their noses on the cement floor, and by the time they were 8 or 10 weeks old, their noses started turning a little crooked. It took 7 months to a year to bring the pigs to market weight. Normal time is 5½ to 6 months. In June of 1969, 96 young pigs had nose problems and on June 11, 1969, plaintiffs' veterinarian diagnosed the disease as atrophic rhinitis, a contagious, infectious disease peculiar to swine. No one is absolutely certain what causes the disease but it is caused by one or more organisms and viruses. It is primarily transmitted by contact, and/or droplets from the nose which could contaminate the feed and water. The symptoms are excessive sneezing, nasal discharge, watery eyes, some hemorrhaging from the nose, deviation of the snout and malocclusion of the jaws in young pigs, and gauntness and rough-hair coat. Because of lower resistance, the animals may contract pneumonia. It may take 30 to 60 days for the symptoms to manifest themselves. There is no way to vaccinate against the disease and no cure for it. It is not a killer. "It just makes poor pigs out of them." They can still be sold for human consumption.

Ruskamps' veterinarian recommended marketing all plaintiffs' herd of swine, disinfecting the premises and buildings and allowing them to remain empty for 3 to 6 months before restocking. The plaintiffs sold their herd and discontinued hog raising for approximately 1 year.

The defendant's veterinarian testified that there were no signs of atrophic rhinitis in the Larson herd in South Dakota when he examined the animals on October 31, 1968, about a week before the shipment of these

gilts. He acknowledged that the disease could be characterized as a latent disease.

Larson was a bailee of the defendant and had been since July 1967. All his breeding stock was supplied by the defendant and belonged to the defendant. He received a fee from the defendant, partly payable when the gilts reached a certain weight and the balance when they were sold by the defendant. He testified that the gilts were sold and delivered for the purpose of breeding and improving the breeding stock of the farmers who purchased them. In his opinion the defendant's gilts were a better yielding, better meat-type hog with less back fat. He also testified that he never had atrophic rhinitis in his herd during his 20 years in business.

Delivery from the Larson farm was made by truck and the same truck delivered animals to three purchasers in addition to Ruskamp. Two of those purchasers testified that the animals they received in that shipment manifested the symptoms of atrophic rhinitis and that they had not had it in their herds before. One of the purchasers also testified that he visited the Larson farm in the spring or early summer of 1969, and, in his opinion, a large percentage of the hogs he saw there had atrophic rhinitis. They had crooked noses, lots of sneezing, and some had blood on their snouts.

The trial court withdrew any issue of express warranty from consideration by the jury, apparently upon an interpretation of the parol evidence rule. The matter was submitted to the jury on the issue of implied warranty of fitness for the particular purpose for which the goods were required, and no error has been assigned regarding the instructions. The jury returned a verdict for the plaintiff in the sum of $14,500 and there is no dispute as to the amount of damages.

The defendants essentially contend that where animals are sold with an implied warranty of fitness for breeding purposes, the scope of the warranty is limited to breed-

ing and producing offspring, and that no warranties as to disease may be implied where there are express warranties that the animals have been vaccinated or tested for certain specified diseases. Defendants also contend that under the usage of the trade, there is a particular designation for a hog that is guaranteed by the seller to be free of all disease. The argument is that there can be no implied warranty of soundness or freedom from a disease involving fitness for a particular purpose where the parties know they are not dealing with that kind of animal.

It should be noted here that defendant's written guarantee provided that if any gilt proved to be a nonbreeder within 90 days after receipt by the buyer, the buyer would receive full credit for the purchase price of the animal provided he had followed handling procedures required by the defendant. The defendant complied with that guarantee with respect to the six gilts that did not breed.

Section 2-315, U. C. C., provides: "Where the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods, there is unless excluded or modified under the next section an implied warranty that the goods shall be fit for such purpose."

With exceptions not here material, section 2-316, U. C. C., provides in part: "* * * to exclude or modify any implied warranty of fitness the exclusions must be by a writing and conspicuous. Language to exclude all implied warranties of fitness is sufficient if it states, for example, that 'There are no warranties which extend beyond the description on the face hereof.' * * * (c) an implied warranty can also be excluded or modified by course of dealing or course of performance or usage of trade."

Section 2-317, U. C. C., provides that warranties,

whether express or implied shall be construed as consistent with each other and as cumulative wherever such construction is reasonable and specifically provides that: "Expressed warranties displace inconsistent implied warranties other than an implied warranty of fitness for a particular purpose."

There is nothing in any of the printed or written warranties of the defendant which excludes any implied warranty of fitness. Neither do we find any inconsistency between the implied warranty of fitness here and any express warranties. Even if there were an inconsistency, section 2-317, U. C. C., specifically provides that any implied warranty of fitness for a particular purpose would not be displaced.

The evidence is substantially without contradiction that Ruskamp purchased the gilts from the defendant "for the purpose of breeding and raising pigs and improving the quality of his herd." The defendant was aware of Ruskamp's requirements and Ruskamp relied on the defendant to select and furnish suitable animals. The facts here clearly establish an implied warranty of fitness for a specific purpose, which the defendant did not exclude or modify as it might have done under the provisions of section 2-316, U. C. C.

The defendants contend that an implied warranty of fitness of an animal for breeding purposes is limited to breeding and producing offspring exactly as provided by the express warranty here, and that an implied warranty does not extend to the soundness of the animals nor the quality of offspring nor that they will not communicate a disease to other hogs. Defendants cite cases such as Barton v. Dowis, 315 Mo. 226, 285 S. W. 988 (1926), in support of that proposition. That case held that in the sale of animals the rule of caveat emptor applies and there is no implied warranty that the animals are free from disease. It also held that an implied warranty of fitness for breeding purposes was not a warranty that the hogs would not communicate

a disease to other hogs. Obviously the case was long before the days of the Uniform Commercial Code.

We think the view expressed by the Idaho court in the case of Paullus v. Liedkie, 92 Idaho 323, 442 P. 2d 733 (1968), reflects a far more realistic viewpoint on the subject. That court said: "When one sells hogs for breeding, with an implied warranty that they are fit for that purpose, and the hogs turn out to be infected with a disease that renders them useless as breeders, and in fact substantial numbers of the piglets die, then it would be ridiculous to say that the pigs were fit for the purpose intended." Where, as in this case, the gilts were infected with a disease which caused them to produce smaller litters of pigs than other gilts of the identical kind which were not diseased and where the pigs actually produced took a much longer time to bring to market condition because of the disease, and the disease adversely affected the entire herd, it seems equally illogical to say that the gilts were fit for the purpose intended.

It seems clear that at least with the advent of the Uniform Commercial Code, the old rule that there is no implied warranty of soundness in the sale of animals where the unsoundness is hidden, unknown to the seller, and difficult to discover, is no longer in effect where there is an implied warranty of fitness for a particular purpose under the provisions of the Uniform Commercial Code.

The Iowa case of Reed v. Bunger, 255 Iowa 322, 122 N. W. 2d 290 (1963), makes it clear that the older decisions in that state applying the doctrine of caveat emptor to the purchase of animals are no longer in effect, and that there may be an implied warranty of reasonable fitness of an animal notwithstanding the seller's lack of knowledge that it does not comply with the warranty.

In Ver Steegh v. Flaugh, 251 Iowa 1011, 103 N. W. 2d 718 (1960), a statement by the seller that boars were

good breeders and clean was found not inconsistent with an implied warranty of fitness for a particular purpose and the court specifically held that where a seller sells an animal for breeding purposes, knowing that the buyer is buying the animal for that purpose there is an implied warranty of its reasonable fitness therefor and that it is not infected with any disease which destroys its value for such purpose. That court also held that there may be an implied warranty of fitness for a particular purpose notwithstanding the seller's lack of knowledge that the animal does not comply with the warranty and notwithstanding the difficulty of discovering the fact.

The clear implication of the cases involving animals is that soundness is an element of fitness for a particular purpose. In the case now before us, the jury was specifically instructed that the plaintiffs were required to prove, in addition to other things, "that the plaintiff relied upon the implied warranty of the defendants as to the soundness and fitness for their intended use." No error has been charged with respect to that instruction.

In Long v. Carpenter, 154 Neb. 862, 50 N. W. 2d 67, this court dealt with an express warranty that a show animal was sound when at the time of purchase the animal was allegedly unsound and unfit for use as a show horse because of a latent, progressive, and incurable defect or disease. This court said: " 'A warranty that an animal is sound implies the absence of any defect or disease which impairs or in its progress will impair the animal's natural usefulness for the purpose for which it is purchased, which defect must be existent at the time of sale, and is breached by any defects which render it permanently less serviceable, as, for example, a disease, or malformation of the animal's body or the animal's disposition, although the defect may not be fully developed at the time of the sale, and although the defect was not known to the seller.' "

We hold that where a seller sells animals for the purpose of breeding and raising young and improving the quality of a herd, knowing that the buyer is buying the animals for such purposes and is relying on the seller's skill or judgment to select or furnish suitable animals, there is an implied warranty that the animals are reasonably fit for such purposes and that they are not infected with a disease which substantially destroys their value for such purposes.

Whether there has been a breach of warranty, express or implied, is largely a question of fact. There was evidence from which the jury could find that the breeding gilts here were infected with atrophic rhinitis at the time of sale and delivery of the animals to the plaintiffs. The jury was also entitled to find that because of that disease, the animals were unfit for the particular purposes of breeding and raising pigs and improving the quality of plaintiffs' herd. The fact that the animals produced smaller litters of pigs than identical gilts which were not diseased and that the pigs took longer to bring to market condition was clearly relevant on the issue of fitness for the particular purpose for which the gilts were sold and purchased. The liability of the defendant for a breach of the implied warranty of fitness for the particular purpose is not affected by the fact that the defendant was unaware of the existence of the disease at the time of the sale and delivery of the animals. To return to the doctrine of caveat emptor is wholly unacceptable. If the defendant desired to exclude implied warranties imposed by the Uniform Commercial Code, it could have done so.

The claim that a usage of the trade with respect to an SPF hog modifies the provisions of the Code with respect to implied warranties is not supported by the evidence. Defendants' contention, if correct, would eliminate any implied warranty of fitness for a particular purpose in the case of hogs, whenever the unfitness arose because of any disease. That position is untenable.

The judgment of the District Court was correct and is affirmed.

AFFIRMED.