Roy C. RITTER, Appellee,

v.

**UNITED STATES FIDELITY AND GUARANTY COMPANY,**
Appellant.

No. 77–1700.

United States Court of Appeals,
Eighth Circuit.

Submitted Jan. 12, 1978.

Decided April 6, 1978.

---

Tilden P. Wright, III, Putman, Davis, Bassett, Cox & Wright, Fayetteville, Ark., for appellant.

H. Franklin Waters, Crouch, Blair, Cypert & Waters, Springdale, Ark., for appellee.

Before GIBSON, Chief Judge, VAN OOSTERHOUT, Senior Circuit Judge, and ROSS, Circuit Judge.

PER CURIAM.

This is an action for declaratory judgment to determine whether United States Fidelity and Guaranty Company (USF&G) has a duty to defend its insured, Roy C. Ritter. The District Court[1] ruled in favor of Ritter and USF&G appeals.

Ritter has a Personal Excess Indemnity Policy with USF&G, which extends cover-

1. The Honorable John E. Miller, Senior United States District Judge, Western District of Arkansas.

age from March 31, 1976, until March 31, 1979. This policy provides that USF&G will indemnify Ritter for the ultimate net loss which he shall become legally obligated to pay because of personal injury or property damage. The policy defines "personal injury" to include "libel or slander or a publication or utterance in violation of an individual's right of privacy." Under the policy, USF&G undertakes the duty to "defend any suit against the Insured seeking damages on account of personal injury or property damage, even if any of the allegations of the suit are groundless, false or fraudulent * * *." The policy expressly excludes coverage of "business pursuits" and defines "business" as "any employment, trade, occupation or enterprise, other than farming."

On September 27, 1976, Roy C. Ritter, the mayor of Springdale, Arkansas, drew up and caused to be published in the local newspaper an advertisement expressing his views on a proposed "lifeline" electric rate program which would lower residential and small business rates and raise large commercial and large industrial business rates. This proposed increase had been a subject of controversy in Springdale. The Arkansas Community Organization for Reform Now (ACORN), an unincorporated association, had circulated among Springdale residents an initiative petition seeking the adoption of the "lifeline" rates in the form of a municipal ordinance. A review of the record reveals that some 800 to 900 persons, a number of whom were members of ACORN, had signed this petition, which had then been submitted to the city clerk. In his September 27, 1976, advertisement in the *Springdale News,* Mayor Ritter expressed his concern with the possible impact of increased electric rates upon the Springdale business community. He reproduced the ACORN petition, complete with the names of its signatories, with the accompanying remark: "[M]any have told me they didn't realize what it [the petition] was." [2]

On October 6, 1976, ACORN instituted suit against Ritter in federal court on the basis of the September 27, 1976, advertisement. ACORN's complaint, which was filed on its own behalf and on behalf of its members, alleged that Ritter's advertisement had infringed plaintiffs' first, ninth and fourteenth amendment rights in violation of 42 U.S.C. §§ 1983 and 1988; that Ritter's "false assertion and broad reference subjected plaintiffs to public hatred, contempt, obloquy and ridicule, in that plaintiffs have been presented as ignorant fools and irresponsible citizens"; and that Ritter's conduct had "singled out for discriminatory treatment those who have promoted and signed the 'lifeline' initiative petition, as distinguished from promoters and signers of other petitions, in that while the former have been singled out for public exposure, obloquy, hatred, ridicule and contempt, the same has not held true for the latter." ACORN sought damages in the amount of $1,000,000. [3]

---

**2.** Mayor Ritter's full introductory statement to the publication of the initiative petition reads:

> As Mayor of Springdale, I am very much concerned about what the outcome will be when our business community and the citizens of Springdale fully realize what the Lifeline Rate will do to our community if it was to pass and become law. If the Lifeline Rates would become a reality approximately 27 businesses in Springdale that employ most of the workers in our city would have their electric bills increased 40.1 per cent. Our city has grown and prospered by people working together. If this unfair program is allowed to pass and the extra burden is put on the companies that furnish most of the employment in Springdale's city limits, I think we will see a drastic setback in Springdale's progress. This Lifeline Rate program will put the businesses of Springdale at a disadvantage with competition from other areas. This will reflect on their ability to maintain a good salary schedule. The Lifeline petitions that was presented read as follows: (reproducing petition) and was signed by the following people. Many have told me they didn't realize what it was.

**3.** While we express no opinion on the ultimate merits of ACORN's complaint, we cannot forego stating that they appear dubious at this point. The mayor of a city, as well as any citizen, should be able under the first amendment to express an opinion on the relative merits of an initiative petition. Mayor Ritter's remarks here were clearly not libelous per se and appear innocuous in the political arena.

Ritter called upon his personal liability insurance carrier, USF&G, to defend the ACORN suit. USF&G refused to undertake Ritter's defense in the ACORN suit for its stated reason that this suit is for the deprivation of civil rights, a type of personal injury that is not covered by its policy. Additionally, USF&G argues that any conduct by Ritter which may have given rise to a cause of action by ACORN falls within the "business pursuits" exclusion of the policy. Upon USF&G's refusal to defend him, Ritter filed suit for declaratory judgment. The District Court held that USF&G has a duty to defend Ritter under its policy. USF&G appeals, contending that, despite the provision in its insurance contract with Ritter whereby it agrees to defend any suit against Ritter seeking damages on account of personal injuries, it has no duty to defend the ACORN suit.

In considering the scope of USF&G's duty to defend under its policy with Ritter, we are guided by several well-settled principles of law. The nature of the insurer's duty to defend is purely contractual and depends, in the first instance, on the language of the particular policy involved. *All-Star Insurance Corp. v. Steel Bar, Inc.*, 324 F.Supp. 160, 163 (N.D.Ind.1971). An insurance policy, having been drafted by the insurer, is to be interpreted and construed liberally in favor of the insured and strictly against the insurer. *First Hermitage Life Assurance Co. v. Butler*, 248 Ark. 1164, 455 S.W.2d 135, 136 (1970). The duty of an insurer to defend its insured is much broader than the insurer's obligation to pay any judgment rendered. *Carter v. Aetna Casualty and Surety Co.*, 473 F.2d 1071, 1075 (8th Cir. 1973); *Equity Mutual Insurance Co. v. Southern Ice Co.*, 232 Ark. 41, 334 S.W.2d 688, 693 (1960). The scope of the insurer's obligation to defend is determined by the allegations of the complaint against the insured, regardless of the falsity of any of these allegations. *Carter v. Aetna Casualty & Surety Co., supra; Equity Mutual Insurance Co. v. Southern Ice Co., supra.*

Under USF&G's policy with Ritter, it agreed to defend Ritter in suits for personal injuries caused by, *inter alia,* libel, slander or publication or utterance in violation of an individual's right of privacy. USF&G undertook this duty to defend "even if any of the allegations of the suit are groundless, false or fraudulent * *." It did not limit its duty to defend to only those suits in which all allegations fell within the terms of the coverage. Thus, under the aforementioned principles of law and Ritter's policy with USF&G, if ACORN's complaint against Ritter alleges libel or slander or invasion of privacy, USF&G clearly has a duty to defend Ritter, notwithstanding the fact that the complaint may also allege injuries, such as the deprivation of constitutional rights, not covered by the policy.

ACORN's complaint does not specifically denominate the alleged injuries in terms of particular varieties of defamation. This lack of denomination neither invalidates the complaint nor necessarily precludes the duty to defend, however. The District Court examined the allegations in ACORN's complaint in light of the Arkansas criminal statute defining libel, Ark.Stat.Ann. § 41–2401 (1964), and concluded that ACORN's lawsuit was one which USF&G has a duty to defend. Our examination of the complaint leads us to the same conclusion. The language in the ACORN complaint tracks not only the Arkansas libel statute, but also the classic definitions of libel.[4] Thus, ACORN's complaint alleges a personal injury covered by USF&G's policy with Ritter, and USF&G has the duty to defend Ritter.[5]

---

4. Prosser, for example, defines a defamatory communication as "one which tends to hold the plaintiff up to hatred, contempt or ridicule, or to cause him to be shunned or avoided." W. Prosser, The Law of Torts 739 (4th ed. 1971).

5. Naturally, our determination that ACORN's complaint contains allegations of injury which suffice to compel USF&G to defend Ritter has no bearing on the actual merits of ACORN's lawsuit and cannot be read as evidencing a belief on our part that ACORN, substantively speaking, has a plausible case. Indeed, we find it difficult to conceive of Mayor Ritter's advertisement, which was nothing more than a timely exercise of his first amendment right to free

USF&G may not avoid this duty to defend by reliance on the "business pursuits" exclusion of its policy. We note initially that this exclusion is defined in ambiguous and sweeping terms and that under Arkansas law, as previously declared by Judge Miller, the words of an exclusionary clause must be construed strictly against the insurer. *Phillips v. Midwest Mutual Insurance Co.*, 329 F.Supp. 853, 858 (W.D.Ark. 1971). The exclusionary clause at issue here contains no reference whatsoever to political activity and, under Arkansas law, it would be impermissible to read such a reference into the policy. Ritter clearly published the September 27, 1976, advertisement in the course of his duties as mayor of Springdale. USF&G has cited no authority supportive of the conclusion that political functions integral to the performance of an elected public office constitute business pursuits, and on the facts here, we can find no basis for equating mayoral duties with business pursuits. Accordingly, USF&G's duty to defend Ritter is not excused by the "business pursuits" exclusion in its policy.

Ritter received an award of attorney fees from the District Court. He now requests that, pursuant to Ark.Stat.Ann. § 66–3239 (1966), we grant him additional attorney fees for services rendered on appeal. We deem this request appropriate on the facts here and order an additional fee of $1,200 be assessed and paid to Ritter as part of the costs of this appeal. *Curran v. Security Insurance Co.*, 195 F.Supp. 562 (W.D.Ark.), *appeal dismissed,* 296 F.2d 733 (8th Cir. 1961).

The judgment of the District Court is affirmed.

speech made in the context of a political controversy, as an instrument capable of inflicting contempt, hatred, ridicule or obloquy on any of the large number of signatories of the petition or on ACORN. However, a determination on the merits of ACORN's suit is not called for on the present appeal.