CORNHUSKER AGRICULTURAL ASSOCIATION, INC., A NEBRASKA CORPORATION, APPELLANT, V. EQUITABLE GENERAL INSURANCE COMPANY, A TEXAS CORPORATION, APPELLEE.
STANLEY C. AND RUSSELL L. SCHELKOPF, APPELLANTS, V. EQUITABLE GENERAL INSURANCE COMPANY, A TEXAS CORPORATION, APPELLEE.

392 N.W.2d 366

Filed August 15, 1986.    No. 84-608.

Jon H. Berkey and Jonathan A. Braun of Berkey & Braun, and Daniel E. Bryan of Heinisch & Bryan, for appellants.

Kevin Colleran and Terry R. Wittler of Cline, Williams, Wright, Johnson & Oldfather, for appellee.

KRIVOSHA, C.J., BOSLAUGH, WHITE, CAPORALE, SHANAHAN, and GRANT, JJ.

GRANT, J.

This is an appeal from the district court for Lancaster County, Nebraska, by the plaintiffs-insureds, Cornhusker Agricultural Association, Inc. (Cornhusker), and Stanley C. and Russell L. Schelkopf (Schelkopfs). Both Cornhusker and the Schelkopfs brought separate actions for breach of express and implied duties to defend and for indemnification by Equitable General Insurance Company (Equitable). Equitable had furnished excess insurance coverage to Cornhusker and personal "umbrella" insurance coverage to the Schelkopfs. The cases were consolidated for disposition.

These two cases involve a dispute over the excess insurance contracts and personal umbrella endorsements. In their pleadings both Cornhusker and the Schelkopfs, as insureds under the excess policies and endorsements, claim that the excess carrier, Equitable, (1) had the duty to provide the insureds a defense in three underlying lawsuits, or, alternatively, (2) under the terms of the excess policies and personal umbrella endorsements, Equitable is required to indemnify the insureds for costs and expense (including consequential damages) incurred by the insureds in defending the underlying litigation.

Cornhusker prays for a judgment of not less than

$2,521,856. The Schelkopfs pray for a judgment of not less than $5 million.

The two actions were ultimately decided on cross-motions for summary judgment. On September 14, 1983, the trial court sustained Equitable's demurrer to the second and fourth causes of action in Schelkopfs' first amended petition; and on September 15, 1983, the trial court sustained Equitable's demurrer to the second and fourth causes of action in Cornhusker's fourth amended petition. In each case plaintiffs were given 14 days to file an amended petition "and upon failure to do so, case shall proceed to trial on causes of action I and III."

Our examination of the 1,023 pages of transcript in the record of these cases reveals that no order of dismissal was entered with regard to the second and fourth causes in either case. Plaintiffs' notice of appeal, filed July 25, 1984, states in part that the plaintiffs intend to "appeal . . . from the letter ruling granting a portion of Defendant's Demurrer dated September 16, 1983." Appellants' first assignment of error contends that "[t]he Court erred in sustaining Defendant's Demurrer to the Second and Fourth Causes of Action . . . ." No appealable error results from the mere sustaining of a demurrer. We feel, however, that the issues sought to be presented in appellants' first assignment are addressed in the consideration of the cross-motions for summary judgment.

Summary judgment was entered in Lancaster County District Court granting Equitable's motion for summary judgment and denying plaintiffs' (Cornhusker's and Schelkopfs') motions. The plaintiffs now bring this consolidated appeal. We hold that the action of the trial court was correct, and we affirm.

The facts are as follows. Cornhusker is a wholly-owned subsidiary of Cornhusker Research, Inc., which is in turn owned by Stanley, Russell, Sterling, and Robert Schelkopf. The Schelkopfs are brothers. Stanley is president and Russell is vice president of Cornhusker. Cornhusker is a corporation organized under the laws of the State of Nebraska, with its principal place of business in Shickley, Fillmore County, Nebraska.

Since 1972, Cornhusker has been in the business of breeding, raising, and selling purebred swine. Cornhusker's farms were accredited by the Nebraska SPF Association. SPF, as used in that title, means specific pathogen free. Animals which are SPF certified should be free of specific diseases. In order to maintain SPF accreditation, strict procedures on the farm must be followed as far as isolating the hogs. No non-SPF hogs may be brought onto the farm, and personnel are to follow strict guidelines regarding showering, changing clothing, and disinfecting areas in which the hogs are located. As part of this program, careful records are maintained about the birth of hogs, and they are weighed at 140 days after birth to verify they are healthy, vigorous hogs. The hogs are weighed by representatives of the Nebraska SPF Association, which also conducts periodic inspections of the farms. Hogs which appear to be diseased may be slaughtered and examined to see if they are infected. The farm's SPF accreditation may be suspended if the herd becomes infected. It may even be necessary to have all of the breeding stock slaughtered if a serious disease outbreak is involved.

One of the diseases which SPF hogs are to be free of is atrophic rhinitis, which is a contagious swine disease. It generally manifests itself by a breakdown in the cellular structure of the nose, which is typified by bloody, crooked noses. As a result of the disease, the animals frequently catch pneumonia and in general do not gain weight as desired. A general discussion of the disease is set out in *Ruskamp v. Hog Builders, Inc.*, 192 Neb. 168, 219 N.W.2d 750 (1974).

In 1968 Cornhusker became involved in the Allied Mills, Inc.'s (Allied), hog-leasing program. Allied was a Delaware corporation with its principal place of business in Chicago, Illinois. Under this program, Allied had the first right to purchase all but 10 of Cornhusker's gilts and all of its boars. Allied would then arrange to lease these animals to farmers, and Cornhusker would deliver the animals directly to the farm. By 1974 Cornhusker's hog operation had become an extensive one, with annual sales of approximately $1.5 million.

In 1974 plaintiffs procured liability insurance coverage to cover their various businesses, including the hog operation. On

September 1, 1974, plaintiffs obtained a liability policy from Union Insurance Company, which provided $300,000 of coverage per occurrence, at an annual premium of $4,394. The policy was a standard one, including an obligation on behalf of Union to defend Cornhusker in the event of a liability suit, and was effective from September 1, 1974, to September 1, 1977. Effective January 1, 1975, plaintiffs obtained a $1 million excess liability policy from Equitable in addition to the Union policy. This policy specifically provided that Cornhusker was to maintain $300,000 of underlying coverage. The premium for the initial policy, which covered only 8 months, was $233. This policy was renewed on September 1, 1975, for 1 year, at an annual premium of $1,000. Separate personal umbrella endorsements were added to the excess policy, providing Stanley Schelkopf with $1 million of umbrella coverage and providing Russell Schelkopf with $3 million of umbrella coverage.

In April 1976 Cornhusker sold 345 head of swine to Allied. Pursuant to a contract dated April 27, 1976, Allied leased the swine to Plainview Farms, Inc., a Texas corporation (Plainview). The swine were delivered by Cornhusker in six deliveries from May to October 1976.

After these hogs arrived at Plainview, significant problems developed in the Plainview herd. Plainview claimed the herd began to develop symptoms of atrophic rhinitis, and the farm's population was substantially damaged. Stanley and Russell Schelkopf went to Texas and examined the Plainview herd. The Schelkopfs attributed Plainview's problems to poor management and denied the Cornhusker hogs could have been infected with atrophic rhinitis. When no resolution of the problem could be reached, Plainview filed suit in the circuit court for Jackson County, Missouri (hereinafter referred to as the *Plainview-Missouri* suit), in November 1977, and also in the U.S. District Court for the Northern District of Texas, Lubbock Division (hereinafter referred to as the *Plainview-Texas* suit), in May 1978. Both lawsuits sought actual damages in the amount of $519,342, and the suits, in addition, sought punitive damages, as compensation for property damage allegedly incurred, as the result of the "infection" or

"contamination" by Cornhusker's swine to Plainview's preexisting swine herd and farm premises. Essentially the same lawsuit was filed in each jurisdiction—Missouri jurisdiction being based on the fact that the contracts were executed in Missouri, and Texas jurisdiction being based on Texas as the place of performance of the contract.

At or about the same time, Allied leased certain other swine, also purchased from Cornhusker, to Dennis and Otto Stigge of Washington County, Kansas. These swine were delivered by Cornhusker to the Stigge farm on or about August 10, 1976.

On December 13, 1978, also because of alleged diseases in the Stigge swine, Dennis and Otto Stigge filed an amended complaint in the U.S. District Court for the District of Kansas against Allied, Cornhusker, and its president, Stanley Schelkopf (hereinafter referred to as the *Stigge* suit), seeking compensation in the amount of $150,000 for "loss of income, loss of use," and for "certain expenses during the one-year period his facilities were idle and during the period it took to re-populate his farm with swine."

Cornhusker gave both Equitable and Union timely notice of the *Plainview-Missouri*, *Plainview-Texas*, and *Stigge* suits and requested Equitable for indemnification. Cornhusker's notice to Union also requested a defense of the suits against Cornhusker. Neither Equitable nor Union offered to provide Cornhusker with a full defense of the *Plainview-Missouri, Plainview-Texas*, or *Stigge* suits. Union responded that only a portion of the claims asserted against Cornhusker was covered by Union's policy and offered a partial defense with reservations. Equitable responded that it was "unable to find coverage" for the claims and did not offer Cornhusker either a defense or indemnification.

Faced with a partial defense from Union and an outright refusal to indemnify by Equitable, appellants undertook their own defense to the *Plainview* and *Stigge* cases. The appellants apparently filed separate declaratory judgment actions against both Union and Equitable in Lancaster County District Court to compel both of their insurers to tender coverage.

In May 1980 the *Stigge* case was settled by the payment of $20,000, shared equally between Cornhusker and Allied, the

other corporate defendant in the case.

The *Plainview-Missouri* case went to trial in December of 1979. On February 27, 1980, after $13\frac{1}{2}$ weeks of trial in which 90 witnesses (30 of whom were experts) were called, a verdict was returned by the jury against both Allied and Cornhusker in the amount of $650,000 in actual damages and for $375,000 against Cornhusker and Allied, each, for punitive damages. The case against the Schelkopfs individually was dismissed before trial. The court in the *Plainview-Missouri* case entered its judgment memorandum in accordance with said verdict on February 29, 1980, and amended it on June 3, 1980, with no effect on the issues before this court.

In April of 1982, as part of a consolidated settlement, Plainview accepted a payment of $375,000 from Cornhusker in settlement of its claim against Cornhusker for the full amount of the punitive damages award and for $25,000 in partial satisfaction of the actual damages claimed. Earlier, Cornhusker and the Schelkopfs had entered into a settlement with Union in which Union paid them $650,000 in settlement of their claims against it. As part of the settlement, Union expressly conceded that the *Plainview* action "asserted claims that were arguably or potentially within the coverage provisions of the Farmowners - Ranchowners policies, in effect on the dates of alleged occurrences." However, Union continued to deny that these claims were within the actual coverage of that policy.

The Schelkopfs and Cornhusker then filed amended pleadings in this action which reflected the above settlement. The amended petitions which control this case are last-filed petitions in each case. Those petitions are the first amended petition of the Schelkopfs and the fourth amended petition of Cornhusker. See *Raskey v. Michelin Tire Corp., ante* p. 520, 391 N.W.2d 123 (1986). Both petitions were filed in Lancaster County District Court on March 25, 1983. Both petitions asserted four identical causes of action on behalf of each of the appellants: (1) "Breach of Contract/Breach of Equitable's Express Duty to Defend Cornhusker's Officers Under the Personal Umbrella Endorsements to the Policies"; (2) "Breach of Contract/Breach of Equitable's Implied Duty to Defend Cornhusker and Its Officers Under the General

Insuring Agreements to the Policies"; (3) "Breach of Contract/Declaratory Judgment of Equitable's Express Duty to Indemnify Cornhusker and Its Officers Under the Policies in General and Under the Personal Umbrella Endorsements to the Policies"; and (4) "Breach of Fiduciary Duty of Good Faith and Fair Dealing."

Equitable filed its answers on April 4, 1983. With regard to the second and fourth causes of action, Equitable stated that the allegations in the petitions "do not state facts sufficient to constitute a cause of action under Nebraska law." The trial court sustained Equitable's demurrer. As above stated, appellants did not amend their petitions but instead filed a "Renewed Motion for Summary Judgment" on October 17, 1983, requesting the trial court to enter an "Order of Partial Summary Judgment . . . on the issue of liability alone." Equitable also filed a motion for summary judgment on November 1, 1983. A final hearing was held on the motions for summary judgment on March 21, 1984. On June 29, 1984, the trial court entered its order overruling the appellants' motion for summary judgment and sustaining Equitable's motion for summary judgment. The appellants timely appealed to this court.

A motion for summary judgment shall be granted "if the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." See Neb. Rev. Stat. § 25-1332 (Reissue 1985). If there is a genuine issue of fact, summary judgment may not be granted. *City Bank & Trust Co. v. Van Andel*, 220 Neb. 152, 368 N.W.2d 789 (1985). In reviewing a summary judgment this court must take the view of the evidence most favorable to the party against whom the motion is directed and give that party the benefit of all favorable inferences which may be drawn from the evidence. *City Bank & Trust Co. v. Van Andel, supra*; *Gall v. Great Western Sugar Co.*, 219 Neb. 354, 363 N.W.2d 373 (1985).

The party moving for summary judgment has the burden of showing that no genuine issue as to any material fact exists; therefore, that party must produce enough evidence to

demonstrate his entitlement to a judgment if the evidence remains uncontroverted, after which the burden of producing contrary evidence shifts to the party opposing the motion. *City Bank & Trust Co. v. Van Andel, supra.* Summary judgment is an extreme remedy to be awarded only when the issue is clear beyond all doubt. *Yankton Prod. Credit Assn. v. Larsen*, 219 Neb. 610, 365 N.W.2d 430 (1985).

The record shows that there are no genuine issues of fact and that the trial court was correct in sustaining Equitable's motion for summary judgment.

The appellants have assigned six assignments of error. In their first assignment of error, appellants raise two issues.

Insofar as appellants contend that the trial court erred "in sustaining Defendant's Demurrer to the Second and Fourth Causes of Action," this opinion will not specifically address that issue for the reasons above set out. The issues raised will be considered in connection with the trial court's rulings on the cross-motions for summary judgment. As previously stated, appellants' second cause of action in each case alleges that Equitable breached its "implied duty to defend" both Cornhusker and the Schelkopfs. In support of their position the appellants alleged in their petitions that "at no place in the Policies, or the Endorsements . . . did Equitable expressly exclude an obligation on its part to defend its insured." We disagree. Paragraph 5, under the heading "Conditions," in the general insuring agreements provides in part as follows:

> The Insured shall be responsible for the investigation, settlement or defense of any claim made or suit brought or proceeding instituted against the insured *which no underlying insurer is obligated to defend.* The insured shall use due diligence and prudence to settle all such claims and suits which in the exercise of sound judgment should be settled, provided, however, that the insured shall make no settlement for any sum in excess of the retained limit without the approval of the company.
>
> The company shall have the right and shall be given the opportunity to associate with the insured or its underlying insurers, or both, in the defense and control of any claim, suit or proceeding which involves or appears reasonably

likely to involve the company and in which event the insured, such insurers and the company shall cooperate in all things in defense of such claim, suit or proceeding. (Emphasis supplied.)

The trial court correctly found that the language of paragraph 5 "expressly give[s] Equitable the *right* to defend [but] do[es] not provide an express duty to defend." (Emphasis supplied.) In the present case Union, as the primary carrier, had a duty to defend Cornhusker and the Schelkopfs in the underlying lawsuits. Even though Union did not admit that the *Plainview* and *Stigge* suits were claims which were "actually within" coverage of its policy conditions, it did admit that they were "arguably or potentially within the coverage provisions." Union effectuated a settlement with Cornhusker and the Schelkopfs to the limits of its policy. There is no factual dispute but that Union had an express duty to defend the appellants in the underlying lawsuits and that appellants successfully maintain their position that Union had such a duty in effectuating their settlement with Union. Equitable, as the excess insurer, had no duty to defend the appellants because it expressly limited any duty to defend in paragraph 5. Any rights the appellants have to recover the costs of their defense in the underlying lawsuits must be found in the indemnification portions of the policy.

In addition, Equitable had no duty to defend the Schelkopfs, either expressly or impliedly, under the personal umbrella endorsements. The endorsements provide, under the "Exclusions" part of the policy, as follows: "This Endorsement shall not apply: 1. (a) to any business pursuits of the Insured other than activities therein which are ordinarily incident to non-business pursuits."

The trial court determined, as a matter of law, "that the conduct which gave rise to the underlying lawsuits was clearly business related." The trial court was correct in so ruling when it stated:

> The combined activities of the various associations and corporations connected with Cornhusker indicate that it was a multi-million dollar enterprise. The Schelkopfs' position that their activities in connection with

Cornhusker were not business pursuits is discredited as a matter of law. Thus, there is no issue of fact but that the plaintiffs, Stanley and Russell Schelkopf, and each of them, at all times relevant to the underlying litigation were involved in business pursuits.

That being the case, the trial court held that Equitable is not required to either defend or indemnify the appellants for any costs arising out of the underlying lawsuits. We agree.

The appellants, however, contend that the "business pursuits" exclusion in Equitable's policy did not relieve it of its duty to defend appellants. Appellants rely on *Camden Fire Ins. Ass'n v. Johnson*, ____ W. Va. ____, 294 S.E.2d 116 (1982), and *Ritter v. U.S. Fidelity & Guaranty Co.*, 573 F.2d 539 (8th Cir. 1978). Appellants argue that these cases stand for the proposition that in order for an insurer to deny an insured coverage based on a "business pursuits" exception, the pleadings filed against the insured must make it clear that the insured is being impleaded on the basis of "business pursuits." Business pursuits is defined as a "continuous or regular activity engaged in by the insured for the purpose of earning a profit or a livelihood." See *Camden, supra* at ____, 294 S.E.2d at 119. In their brief at 29, appellants submit that Equitable "made no showing that the liability claimed arose out of the 'continuous or regular activity' " of the appellants or that the liabilities alleged against the appellants were attributable to "business pursuits." We have reviewed the *Plainview* and *Stigge* pleadings and have found them to be more than adequate to serve notice to Equitable that the alleged wrongs by the appellants were within their business activities or business pursuits.

Appellants also argue that Equitable is estopped from raising the business pursuits exclusion because when Equitable denied coverage in September 1978, it did not expressly deny coverage based on the business pursuits exclusion. Appellants rely on the rule in *Brown v. Security Mutual Life Ins. Co.*, 150 Neb. 811, 36 N.W.2d 251 (1949), which states that where a party gives a reason for his conduct and a decision touching anything involved in a controversy, he cannot, after litigation has begun, "mend his hold" and put his conduct upon another and different consideration. In denying coverage to appellants,

Equitable stated that "[w]e failed to find anything within these pleadings [*Plainview* and *Stigge*] which would be covered under the Umbrella Liability policy." In making that general statement Equitable cannot be denied the opportunity to later give a more specific reason.

Lastly, appellants argue in their brief at 34 that the business pursuits exclusion "is void because it contradicts the intent of the Policies and the reasonable expectations of the insureds." Appellants contend that the trial court erred "by failing to give weight" to the affidavit of Russell Schelkopf and by excluding the affidavit of William Brinkman, the agent who sold the Schelkopfs their policies. These affidavits were filed in objection to Equitable's motion for summary judgment. Appellants contend that proper consideration of these affidavits raises material questions of fact. A review of these affidavits shows that Brinkman represented to the Schelkopfs that the personal umbrella endorsements "would provide coverage to Stanley Schelkopf and Russell Schelkopf for claims against them personally arising out of Cornhusker's farming operations, or otherwise." At the very least, the Schelkopfs request reformation of the contract because the policies did not afford that coverage which the Schelkopfs reasonably expected the policies would cover. The trial court was correct in excluding the affidavits when interpreting the provisions of the endorsements. To rely on this evidence instead of the written endorsements themselves would violate the parol evidence rule.

We conclude that Equitable did not have a duty to defend Cornhusker or the Schelkopfs under the general insuring agreement. The trial court was also correct in determining that the business pursuits exclusion in the personal umbrella endorsements excluded coverage to the Schelkopfs. Equitable did not have an implied duty to defend.

With regard to the appellants' fourth cause of action (breach of fiduciary duty of good faith and fair dealing), the trial court determined that since "Equitable had neither an express nor an implied duty to defend Cornhusker or the Schelkopfs," any "claim for damages for lack of good faith is mooted." It follows that if Equitable never had an express or implied duty to defend, no duty of good faith or fair dealing could ever arise.

The trial court was correct.

Appellants' reliance on *Allstate Ins. Co. v. Novak*, 210 Neb. 184, 313 N.W.2d 636 (1981), is misplaced. The *Novak* case held that an insurer has a duty to defend whenever it ascertains facts which give rise to the potential of liability under the policy. The *Novak* case involved primary coverage. The instant case involves *excess* coverage. By the terms of the excess policies, the duty to defend is strictly upon the underlying insurer or on the insured. The insuring agreement in this case is entirely different than the insuring agreement in *Novak*.

The only cause of action remaining to be considered is the third cause of action, which alleges that Equitable has a "duty to indemnify" the appellants for their costs associated with the underlying lawsuits. The trial court was again correct in finding that the appellants are not entitled to indemnification for actions under either the general insuring policies or the personal umbrella endorsements. In *Plainview-Missouri*, the case went to the jury on theories of implied warranty and fraudulent misrepresentation. The jury could have awarded punitive damages against Cornhusker in the *Plainview-Missouri* case only because it had found that Cornhusker had fraudulently misrepresented to Plainview that its hogs were free from disease.

The excess policy between Cornhusker and Equitable defined an "occurrence" as to which Equitable contracted to indemnify appellants as: " 'Occurrence' means an accident which takes place during the policy period, or that portion within the policy period of a continuous or repeated exposure to conditions, which causes personal injury, property damage or advertising liability *neither expected nor intended by the insured*." (Emphasis supplied.)

The trial court correctly found that Equitable's excess policies and personal umbrella endorsements do not insure against intentional torts or conduct. There was no issue of fact on this issue, and the trial court was correct in determining that Equitable had no duty to indemnify Cornhusker or the Schelkopfs for their costs in *Plainview-Missouri* and *Plainview-Texas*.

The costs associated with the *Stigge* case were well within the

retained limits of the primary insurer, Union, and thus are not an issue here.

The trial court was correct in granting summary judgment in favor of Equitable and in denying appellants' motion for summary judgment. The court's order is affirmed in its entirety.

AFFIRMED.