**ALLSTATE INSURANCE COMPANY,
Plaintiff,**

**v.**

**Mark BURROUGH and Garnette Bell,
Individually and as Next Friend of
Kenyatta Williams, Defendants.**

**No. 95–2162.**

United States District Court,
W.D. Arkansas,
Fort Smith Division.

Jan. 11, 1996.

Joe Benson, Fayetteville, AR, for Plaintiff.

310

Bill D. Reynolds, Nolan, Caddell & Reynolds, Fort Smith, AR, for defendant Garnette Bell.

## MEMORANDUM OPINION

H. FRANKLIN WATERS, Chief Judge.

Plaintiff Allstate Insurance Company ("Allstate") has filed this action seeking a declaration that it has no duty to defend or to provide coverage to its insured, Mark Burrough. The parties have stipulated to a record and upon careful review of the record, the court is prepared to rule.

## I. BACKGROUND

Defendant Mark Burrough is covered by an Allstate homeowner's insurance policy that obligates Allstate to pay any "damages which an insured person becomes legally obligated to pay because of **bodily injury or property damage** arising from an occurrence to which this policy applies." Also, "if an insured person is sued for these damages, [Allstate] will provide a defense with counsel of **our** choice, even if the allegations are groundless, false or fraudulent."

The basis of potential damages liability against defendant is a lawsuit filed against him by Garnette Bell for injuries that defendant allegedly caused to her son, Kenyatta Williams. The lawsuit arose out of an accidental shooting. On October 22, 1993, Kenyatta Williams was on foot in the parking lot of Harvest Foods in Fort Smith, Arkansas. Two friends of defendant, Christopher Beck and Jeremiah Hauser, were in the same parking lot in a car when Christopher Beck pulled a .22 caliber handgun from the floorboard of the car and "flashed" it towards Kenyatta Williams. The gun accidentally discharged, striking Kenyatta Williams in the Adam's apple, severing his spinal cord, and leaving him a quadriplegic.

Christopher Beck, who was approximately 16 years old at the time of the shooting, received the handgun from Jeremiah Hauser. Jeremiah Hauser, who was approximately 16 at the time of the shooting, had obtained the gun from defendant, who was approximately 14 at the time of the shooting and had taken the gun from his grandfather's residence.

Kenyatta Williams' mother, Garnette Bell filed an action in the Circuit Court of Sebastian County, Arkansas, case number CIV 94–787(III) on behalf of herself and her son, naming Christopher Beck and Jeremiah Hauser as defendants. In her complaint, Bell seeks damages and alleges that Christopher Beck negligently and recklessly shot Kenyatta Williams and that this conduct proximately caused damage to her and her son. She also alleges that Jeremiah Hauser and defendant acted negligently and recklessly in providing Christopher Beck with a gun and that this conduct proximately caused damage to her and her son. Allstate has filed this action seeking a declaration that its homeowner's policy does not provide coverage for defendant's acts.

## II. RELEVANT POLICY PROVISIONS

While Allstate admits that defendant was an insured under the policy at the time of Kenyatta Williams' shooting, it contends that coverage is excluded under a criminal acts exclusion which provides as follows:

**Losses We Do Not Cover Under Coverage X:**

1. We do not cover any bodily injury or property damage intended by, or which may reasonably be expected to result from the intentional or criminal acts or omissions of, any insured person. This exclusion applies even if:

(a) such insured person lacks the mental capacity to govern his or her conduct;

\* \* \* \* \* \*

(c) such bodily injury or property damage is sustained by a different person than intended or reasonably expected; . . .

This exclusion applies regardless of whether or not such insured person is actually charged with, or convicted of a crime.

(Policy, Coverage X, Exclusion 1) (emphasis omitted).

More specifically, Allstate contends that "Burrough's furnishing the .22 caliber handgun to Christopher Beck, a minor, is a criminal offense" under Ark.Code Ann. § 5–73–

109 and that, therefore, coverage under the policy is excluded.

A person commits the offense of furnishing a deadly weapon to a minor when he sells, barters, leases, gives, rents, or otherwise furnishes a firearm or other deadly weapon to a minor without the consent of a parent, guardian or other person responsible for general supervision of his welfare. Ark.Code Ann. § 5–73–109(a) (Michie 1993). A minor is defined as "any person under eighteen (18) years of age." *Id.* § 5–73–101(2) (Michie 1993).[1]

### III. DUTY TO DEFEND

■ As a general matter, the duty to defend is determined by comparing the allegations in the underlying complaint to the scope of the coverage provided by the insurance policy. *Insurance Co. of North Am. v. Forrest City Country Club,* 36 Ark.App. 124, 125, 819 S.W.2d 296 (1991). If injury or damage within the policy coverage could result from the underlying suit, the duty to defend arises. *Home Indemnity Co. v. City of Marianna,* 291 Ark. 610, 727 S.W.2d 375 (1987). If no possibility of coverage exists, there is no duty to defend.

■ In interpreting the policy, traditional rules of insurance policy construction apply. *Ritter v. United States Fid. & Guar. Co.,* 573 F.2d 539 (8th Cir.1978). A policy is to be interpreted and construed like any other contract according to general contract principles to determine the mutual intent of the parties. *Enterprise Tools, Inc. v. Export–Import Bank of U.S.,* 799 F.2d 437 (8th Cir.1986), *cert. denied,* 480 U.S. 931, 107 S.Ct. 1569, 94 L.Ed.2d 761 (1987). However, due to the reality that insurance contracts are contracts of adhesion, the courts have developed some special rules of construction, the most important of which is the rule that when a policy provision is ambiguous, the court must resolve that ambiguity in favor of the insured. *Deal v. Farm Bureau Mut.*

*Ins. Co. of Ark.,* 48 Ark.App. 48, 889 S.W.2d 774 (1994).

■ The determination of ambiguity rests with the court. *Deal, supra.* However, this does not provide the court with license to rewrite the policy, or to import an ambiguity that does not exist, or to force an unnatural or perverted meaning from plain words under the guise of construction. *Looney v. Allstate Ins. Co,* 392 F.2d 401 (8th Cir.1968). Ambiguity exists only if the insurance policy provision is susceptible to more than one reasonable interpretation. *Keller v. Safeco Ins. Co. of Am.,* 317 Ark. 308, 877 S.W.2d 90 (1994).

■ In interpreting a policy, the terms used must be interpreted in their "plain, ordinary and popular sense," rather than their legal or technical meaning. *Southern Farm Bureau Cas. Ins. Co. v. Williams,* 260 Ark. 659, 662, 543 S.W.2d 467 (1976).

### IV. DISCUSSION

#### a. Criminal acts by juveniles

■ Defendants first argue that since Mark Burrough was a juvenile at the time of his alleged criminal offense, he cannot be branded as having committed a criminal act. According to defendants, Mark Burrough can be only adjudicated a delinquent, which would be a civil proceeding. At least one federal court has accepted this argument and has found that a criminal acts exclusion does not apply to the acts of a minor. *Allstate Ins. Co. v. Lewis,* 732 F.Supp. 1112 (D.Colo. 1990).

This court disagrees. It does not matter that Mark Burrough could not be prosecuted as an adult for his crime. *See* Ark.Code Ann. § 9–27–318(b)(1) (Michie 1993). Since he undoubtedly provided a handgun to a minor, he has engaged in conduct that is prohibited as a criminal act under Ark.Code

---

1. Prior to a 1994 amendment, a violation of this provision was always a Class A misdemeanor. *Id.* § 5–73–109(b) (Michie 1993). However, after the 1994 amendment, if the deadly weapon furnished to the minor was a handgun, the violation is a Class B felony. *Id.* § 5–73–109(b) (Repl. 1995). As the incidents that are the subject of

this action took place in 1993, prior to the 1994 amendment, it is not clear which penalty provision applies. However, the court need not address that question as the level of the offense does not affect how this court interprets the criminal acts exclusion at issue in this action.

Ann. § 5–73–109. The criminal acts exclusion applies so long as the insured engages in conduct which is described as criminal in the penal code, "regardless of whether or not such insured person is actually charged with, or convicted of a crime." (Policy, Coverage X, Exclusion 1) (emphasis omitted). Moreover, the "exclusion applies even if: a) such insured person lacks the mental capacity to govern his or her conduct." (Policy, Coverage X, Exclusion 1) (emphasis omitted). This court believes that if the policy does not cover mental incompetents for their criminal acts for which they cannot be prosecuted, then it does not cover minors for their criminal acts for which they cannot be prosecuted.

Other courts have applied the provision to criminal acts by minors as well. *See Allstate Ins. Co. v. Green*, 831 F.2d 145, 147 (6th Cir.1987) ("Under this language it is clear that if young [14 year old] Robertson had raped the girl himself, his act would have been an intentional or criminal act"); *Allstate Ins. Co. v. Dillard*, 859 F.Supp. 1501 (M.D.Ga.1994) (13 year old intentionally pointing or aiming a gun at another without legal justification), *aff'd*, 70 F.3d 1285 (11th Cir.1995).

### b. Public Policy

■ Defendants argue that § 5–73–109 does not contain any requirement of a culpable mental state, and that it would be contrary to public policy to exclude coverage for such strict liability crimes. This argument is rejected.

■ The express language of the policy includes all criminal acts, no matter what the mental state required for their commission. An insurer may contract with its insured upon whatever terms the parties may agree upon which are not contrary to statute or public policy. *Shelter General Ins. Co. v. Williams*, 315 Ark. 409, 867 S.W.2d 457 (1993). The public policy of this state is found in its constitution and statutes. *Guaranty Nat'l Ins. v. Denver Roller, Inc.*, 313 Ark. 128, 854 S.W.2d 312 (1993). The court has not found any relevant constitutional or statutory provision that embodies a public policy against excluding coverage for injuries

resulting from criminal acts, whether or not there is a *mens rea* requirement.

Other courts have also considered this exact same policy exclusion and have held that an insurance policy does not violate public policy by excluding coverage for unintentional criminal acts. *See Allstate Ins. Co. v. Brown*, 16 F.3d 222, 225 (7th Cir.1994) (class D felony of recklessly inflicting serious bodily harm while armed with a handgun); *Allstate Ins. Co. v. Norris*, 795 F.Supp. 272, 275 (S.D.Ind.1992) (class C felony of criminal recklessness by an insured who shot a bystander while trying to "pin down" a third party); *Hooper v. Allstate Ins. Co.*, 571 So.2d 1001, 1003 (Ala.1990) (clause "excluded coverage for injuries resulting from criminal acts of the insured, regardless of whether the insured intended to commit the act or to cause the harm").

Some courts have either limited the application of the criminal acts exclusion to technical violations, public welfare crimes, and criminal negligence, or they have stated they might be willing to do so. *See Tower Ins. Co., Inc. v. Judge*, 840 F.Supp. 679, 693 (D.Minn.1993); *Young v. Brown*, 658 So.2d 750 (La.Ct.App.), *writ denied*, 662 So.2d 1 (La.1995); *Sledge v. Continental Cas. Co.*, 639 So.2d 805, 812 (La.Ct.App.1994); *Allstate Ins. Co. v. Schmitt*, 238 N.J.Super. 619, 570 A.2d 488, *cert. denied*, 122 N.J. 395, 585 A.2d 394 (1990).

This court does not believe any such restrictions on the clear policy language is justified. Mark Burrough's conduct clearly violated Arkansas's criminal code, and "an act is criminal if it violates the State's criminal code." *Brown*, 16 F.3d at 225 (citation omitted). Therefore, there is no coverage if the *injury to Kenyatta Williams could reasonably be expected to follow from Mark Burrough's conduct.* The language of the policy is clear and there is no public policy reason in the Arkansas Constitution or statutes not to follow it.

### c. Foreseeability

■ The only question that remains is whether the injury to Kenyatta Williams was the type of "bodily injury ... which may reasonably be expected to result from the

intentional or criminal acts" of any insured person. The courts have all held that this language creates an objective standard of reasonableness. *See Brown*, 16 F.3d at 225–26 (collecting cases).

The phrase is meant to ensure that the policy's exclusions apply only to those injuries most likely to result from the insured's intentional or criminal conduct. The exclusion is not intended to apply to remote, extraordinary or highly improbable consequences of an insured's intentional or criminal conduct.

*Id.* at 225.

Applying this foreseeability standard to the facts as the court finds them, the court believes that the criminal acts exclusion applies to the insured's conduct. Therefore, there is no possibility of coverage and no duty to defend against the lawsuit filed by Garnette Bell.

The record shows that in August or September of 1993, defendant, who was approximately 14 at the time, stole a .22 caliber handgun from his grandfather's residence and took it home. Over the next couple of months he showed it to his friends, including Jeremiah Hauser and Christopher Beck. Sometimes they would shoot the gun into the ground in a storage shed on defendant's property. On one occasion, while the gun was being handled by a friend of defendant's named Chad Coleman, the gun misfired even though Chad had not touched the trigger or cocked the hammer. Still, defendant and his friends thought the gun was "cool."

In addition to playing with guns, defendant and his friends would pass the time by "cruising Grand." Grand is a long, wide street in Fort Smith, Arkansas, populated with numerous fast food restaurants and like business establishments. Many teenagers would cruise up and down the street for hours. Also, teenagers would hang out in the parking lots of the business establishments along Grand and drink beer, smoke pot, and not infrequently, get into fights. Apparently, there was even some gang-like activity on Grand, or at least defendant and his friends thought that the "Bloods" hung out there wearing red bandannas and gang-like athletic wear. Also, teenagers who defendant and his friends believed to be involved with gangs had harassed them on one or two occasions prior to the night of the shooting.

Jeremiah and Christopher were "cruising Grand" on the night of the shooting. They had been drinking Evan Williams and beer and were drunk. Christopher had the .22 caliber handgun under his seat on the driver's side of his 1984 white Chevy Camaro. On two consecutive passes on Grand, a group of teenagers in a parking lot, who were allegedly wearing gang-like clothing were yelling aggressively at Jeremiah and Christopher. On the third pass, Jeremiah and Christopher claim they were accosted by these teenagers while turning around their car in the Harvest Foods parking lot. Jeremiah described what occurred next in a statement to the police made the night of the shooting.

I could see that two of the subjects that were yelling was running towards us. I also could see several others behind them running towards us. Then Chris stopped his car and thats when the two subjects stopped running and they started walking towards us. I couldnt hear what was being said, but thats when I saw Chris lean down towards the floor board and pull out a gun. When he pulled the gun out he said watch this. By this time the two subjects were standing about four feet from the car window. I then saw Chris take the gun and pointed towards the black guy. I didnt hear Chris say anything but thats when the gun went off. I then looked and thats when I saw the black guy fall. Chris then mashed on the gas and he said Oh no Im dead, and we took off.

This court need not make specific factual findings as to what precisely happened immediately before, during and after the shooting, because Mark Burrough was not present at the time of the shooting. The crucial factual question before the court is how Christopher Beck got the gun from defendant, and what injuries defendant should have "reasonably expected to result" from his criminal act of providing a handgun to a minor.

**314**

In his statement to the police, Jeremiah Hauser described the chain of events leading to Christopher Beck getting the gun as follows.

> [A]bout two weeks [before October 22, 1993] Chris was saying he would like to get a gun and then we met a friend of ours by the name of Mark Barrows. Mark told me and Chris that he had a gun. Chris asked Mark what kind was it and Mark said a 22. This conversation was at Marks house in Van Buren. Mark wouldnt give Chris the gun but later he gave me the gun and told me to give it to Chris. I gave the gun to Chris the very next day which was about two weeks ago. Chris put the gun under his seat.

Christopher Beck also gave a similar statement to a different police officer the night of the shooting explaining how the gun was acquired from defendant.

> About a week [before October 22, 1993], Jeremiah Hauser was given a gun by Mark Burrough. * * * Jerimiah [sic] left the gun in my car and I had kept it in my car for protection. I kept it there to flash it if I needed to get out of a fight or something.

Jeremiah Hauser and Christopher Beck have now attempted to retract their statements that Christopher Beck had expressed his desire to obtain a gun for purposes of "flashing."

The court concludes that these statements give the most likely accurate portrayal of how Christopher Beck acquired the gun from defendant. Like many teenagers, defendant and his friends were involved to varying degrees with cruising in cars, thinking guns are "cool," drinking beer, and watching out for gangs and fights. Defendant and his friends, especially Christopher Beck, had been threatened by people they thought were in gangs, and Christopher Beck wanted a gun to put in his car so that he could "flash" it and look "cool." Defendant participated in this scheme and it foreseeably went awry. Given the fact that the gun had misfired in the past, and since he knew the reason his friends wanted the gun and their intended use of it, he should have reasonably expected that someone might be killed or injured when

he committed the criminal act of providing a minor with a firearm.

## V. CONCLUSION

For the reasons set forth above, the court finds that the plaintiff insurance carrier has no duty to defend the lawsuit which was filed in the Circuit Court of Sebastian County, Arkansas, described above and in the complaint filed in this matter, as a result of a shooting incident which occurred in Fort Smith, Arkansas, on October 22, 1993, resulting in serious injuries to Kenyatta Williams, or any other lawsuit filed by the defendants herein or anyone acting in their behalf, arising out of such incident, nor any duty to pay any judgment rendered in that action or any other action resulting from such incident.