The **NORTH RIVER INSURANCE COMPANY, Plaintiff,**

v.

**PHILADELPHIA REINSURANCE CORPORATION** and **CIGNA Reinsurance Company, successor to INA Reinsurance Company, Defendants.**

Civ. A. No. 91–1323(WGB).

United States District Court,
D. New Jersey.

Sept. 20, 1993.

McElroy, Deutsch & Mulvaney by Vincent E. Reilly, Morristown, NJ, Simpson, Thatcher & Bartlett by Mary Kay Vyskocil, Joseph Wayland, Brian G. Snover, Robert R. Pollowitz, New York City, for plaintiff.

White & Williams by Thomas A. Allen, Ellen K. Burrows, William E. Cox, Marion R. Hubing, Westmont, NJ, for defendant, CIGNA Reinsurance Co.

## OPINION

BASSLER, District Judge:

The plaintiff, The North River Insurance Co., ["North River"] and the defendant, CIGNA Reinsurance Co., ["CIGNA Re"] make cross motions for summary judgment under Fed.R.Civ.P. 56. For the following reasons, the Court grants CIGNA Re's motion for summary judgment and denies North River's summary judgment motion.

## I. BACKGROUND

These summary judgment motions concern whether a reinsurer, CIGNA Re, must reimburse its reinsured, North River, for certain defense cost payments made in settling personal injury claims against the underlying insured, Owens–Corning Fiberglass Corporation. ["Owens–Corning"]. North River paid those defense costs to Owens–Corning after losing an arbitration conducted under the terms of the "Wellington Agreement," an agreement among asbestos producers and insurers that CIGNA Re did not sign.

North River filed a four-count diversity action in this Court on March 29, 1991, seeking: (1) reimbursement on four facultative reinsurance certificates involving CIGNA Re; and (2) a declaratory judgment obligating CIGNA Re to reimburse North River for future losses involving the four certificates. North River also sought reimbursement and declaratory relief against Philadelphia Reinsurance Corporation, ["Philadelphia Re"]. However, by a joint stipulation and order, filed March 17, 1993, the claims against Philadelphia Re have been dismissed.

### A. The Parties

North River, a shell corporation (see Appendix 1 to CIGNA Re's Support Brief, July 26, 1989 ADR opinion, at 1.) wholly owned by Crum & Forster, Inc., ["Crum & Forster"] is a New Jersey corporation with its principal place of business in Morristown, N.J. CIGNA Re, an independently operated subsidiary of CIGNA Property & Casualty Insurance Companies, is a Delaware corporation

with its principal place of business in Philadelphia, Pa. Before June 30, 1987, CIGNA Re was known as INA Insurance Company.

### B. The Underlying Insurance

North River, through another Crum & Forster subsidiary, L.W. Biegler & Co., issued several excess insurance policies to Owens–Corning, including three at issue here, numbered XS–3619, XS–4073 and XS–4423, involving liability coverage from 1974–78. These policies use the same form language and provide, among other things, coverage for asbestos-related bodily injury claims.

XS–3619 provided to Owens–Corning $25 million in liability coverage, as part of a $50 million layer in excess of $26 million in underlying coverage, during each of the following policy periods: (a) June 18, 1974 through October 22, 1974 ["XS–3619(A)"]; (b) October 22, 1974 through October 22, 1975 ["XS–3619(B)"]; and (c) October 22, 1975 through October 22, 1976 ["XS–3619(C)"].

XS–4073 provided to Owens–Corning $30 million in liability coverage, as part of a $50 million layer in excess of $26 million in underlying coverage, for the policy period October 22, 1976 through October 22, 1977.

XS–4423 provided to Owens–Corning $40 million in liability coverage, as part of a $50 million layer in excess of $26 million in underlying coverage, for the policy period October 22, 1977 through September 1, 1978.

Paragraph 1 of each policy provides that "[North River] hereby indemnifies [Owens–Corning] against ultimate net loss." (Appendix 2 to CIGNA Re's Support Brief.) Paragraph 13 provides, in relevant part:

13. Ultimate net loss, as used herein, shall be understood to mean the sums paid in settlement of losses ... and shall exclude all "Costs."

(Id.)

"Costs," in turn, are defined in paragraph 14:

14. The word "costs", as used herein, shall be understood to mean interest on

judgments, investigation, adjustment and legal expenses....

(Id.)

In paragraphs 8 and 9, the policies discuss the basis under which North River might consent to provide defense of claims:

8. ... At no time shall [North River] be called upon to assume charge of the settlement or defense of any claims made or suits brought or proceedings instituted against [Owens–Corning], but [North River] shall have the right and shall be given the opportunity to associate with [Owens–Corning] or its underlying insurer or insurers, or both, in the control, defense and/or trial of any claims, suits or proceedings, which, in the opinion of [North River], involves or appears reasonably to involve [North River]....

9. [Owens–Corning] shall be solely responsible for the investigation, settlement, defense and final disposition of any claim made or suit brought or proceeding instituted against [Owens–Corning] to which this Certificate would apply and which no underlying insurer or insurers is obligated to defend. ....

(Id.)

In paragraph 15, the policies specify that, "with the written consent of [North River]," costs incurred by Owens–Corning could be apportioned under a formula described in that paragraph. (Id.)

North River and another Crum & Forster company, International Surplus Lines Insurance Company, issued a total of 28 insurance contracts to Owens–Corning for the period June 18, 1974 to September 1, 1985, which afford more than $700 million in indemnity coverage, excluding defense costs. (See Appendix 27 to CIGNA Re's Support Brief, at 5.) To date, North River has paid more than $300 million to Owens–Corning in indemnity payments and more than $250 million in defense costs under these insurance contracts. (See Steven A. Falk Affidavit at 3.)

### C. The Reinsurance Certificates

North River bought reinsurance for its risk under the Owens–Corning policies from

many reinsurers. CIGNA Re agreed to reinsure North River's risk under several certificates of facultative reinsurance, including four at issue here, bearing policy numbers FRC–01817, FRC–016186, FRC–019062 and V01078. In exchange for a portion of the premium paid by Owens–Corning, CIGNA Re agreed to indemnify North River for a stated share of North River's risk under the three Owens–Corning policies.

CIGNA Re in 1974 joined a reinsurance pool, established by broker Towers, Perrin, Forster & Crosby, Inc. ["TPF & C"], which issued to North River a typed "Memorandum of Reinsurance," attached to a pre-printed, standard form certificate of reinsurance, drafted by TPF & C, bearing policy number V01078. Under V01078, CIGNA Re provided an 18.5 percent share of the pool's reinsurance coverage of $1 million, as part of North River's $25 million share of excess liability coverage under XS–3619.

CIGNA Re in June 1974 issued to North River a pre-printed, standard form certificate of facultative reinsurance, drafted by CIGNA Re, bearing policy number FRC–01817. Under FRC–01817, CIGNA Re provided reinsurance coverage to North River for $5 million of North River's $25 million share of excess liability coverage under XS–3619.

CIGNA Re in March 1977 issued to North River a pre-printed, standard form certificate of reinsurance, again drafted by CIGNA Re and similar in most respects to the form of FRC–01817, bearing policy number FRC–016186. Under FRC–016186, CIGNA Re provided reinsurance coverage to North River for $5 million of North River's $30 million share of excess liability coverage under XS–4073.

CIGNA Re in March 1978 issued to North River a pre-printed, standard form certificate of reinsurance, using exactly the same form as FRC–016186, this one bearing policy number FRC–019062. Under FRC–019062, CIGNA Re provided reinsurance coverage to North River for $5 million as part of North River's $40 million share of excess liability coverage under XS–4423.

All four of these CIGNA Re certificates contain pre-printed coverage provisions commonly known in the reinsurance industry as a "following form" clause and a "follow the fortunes" clause. For the purposes of these motions, the variation in language among the four certificates is not material to these clauses.

For example, the "following form" clause of FRC–016186, included in Section 1, "Application of Certificate," provides in relevant part:

> ... The liability of [CIGNA Re] shall follow that of [North River] and, except as otherwise specifically provided herein ... shall be subject in all respects to all of the terms and conditions of [XS–4073], except such as may purport to create a direct obligation of [CIGNA Re] to the original insured or anyone other than [North River]....

(Appendix 5B to CIGNA Re's Support Brief.)

The "follow the fortunes" clause of FRC–01686, included in Section 4, "Loss Settlement," provides in relevant part:

> ... All claims involving this reinsurance, when settled by [North River], shall be binding on [CIGNA Re], which shall be bound to pay its proportion of such settlements, and in addition thereto, ... its proportion of expenses, ....

(*Id.*)

The four certificates also include a provision, whose language does not vary significantly among the different certificates, under which CIGNA Re must give its consent to any modification of the certificates. For example, FRC–01686, in Section 11, "Amendments," provides:

> The terms of this Certificate shall not be waived, amended or in any way modified unless contained in an endorsement to this Certificate, executed by a duly authorized representative of [CIGNA Re].

(*Id.*)

There are at least three other reinsurance certificates under which CIGNA Re agreed to reinsure North River for policies involving Owens–Corning, in addition to the four certificates identified in the complaint. CIGNA Re has previously paid more than $30 million in indemnity payments under all of these seven certificates. (CIGNA Re's Support

Brief at 1.) North River argues that CIGNA Re still owes it more than $22 million, plus interest, in defense costs on these certificates. (*Id.*, Exhibit A). As explained below, however, only four of those seven certificates, and approximately $13 million plus interest in defense costs, are at issue here.

### D. The Wellington Agreement and the ADR Proceeding

During the 1970s and early 1980s, personal injury plaintiffs filed thousands of products liability actions stemming from the manufacture and sale of asbestos-containing products, resulting in enormous expenditures by asbestos producers and insurers. In an effort to reduce costs in resolving insurance coverage disputes arising from these actions, many of the largest producers and insurers met under the auspices of the Center for Public Resources, with Yale Law School Dean Harry Wellington acting as mediator. After several years of discussions, many, though not all, of the major producers and insurers signed the June 19, 1985 "Agreement Concerning Asbestos–Related Claims." ["The Wellington Agreement"]

Crum & Forster and its subsidiaries, including North River, signed the Wellington Agreement. (*See* Letter of July 30, 1985 from Crum & Forster Corp. to Aetna Life & Casualty, included in Appendix 7 of CIGNA Re's Support Brief.) Owens–Corning was one of several asbestos producers that signed the agreement. CIGNA Re's parent company, CIGNA Property & Casualty Insurance Companies, also signed. CIGNA Re, however, did not, nor did other reinsurers.

By signing the Wellington Agreement, North River agreed to be bound by certain of its provisions which affect the payment of defense costs. For example, Section XI of the Wellington Agreement, "Allocated Expenses," creates a presumption that issuers of affected policies would pay "allocated expenses," unless the policies expressly provided to the contrary. (*See* Appendix 8 to CIGNA Re's Support Brief, at 7.) Section XXIII defines "allocated expenses" as "all fees and expenses incurred for services performed outside the [Wellington Agreement's special claims handling facility] that can be directly

attributed to the defense and disposition of a particular asbestos-related claim." (*Id.* at 15.)

Ian R. Heap, as senior vice-president for insurance operations, was instrumental in Crum & Forster's decision to sign the Wellington Agreement. However, he recognized that the failure of reinsurance companies to join Wellington could have a negative impact on his company, should it sign. Heap testified at his deposition:

> I was extremely concerned about the inability of the reinsurance community to articulate its position clearly of whether or not it was to give full support to the Wellington Agreement. It seemed to me that the industry had to move along the path of this alternative dispute resolution, and in the public interest we as insurers had to go along with it; *and if in their judgment reinsurers failed to do it, then we had the business risk of being without reinsurance,* and it was one that I felt Crum and Forster was prepared to take.

(Appendix 2 to CIGNA Re's Opposition Brief, at 123–24.) (emphasis added.) Heap wrote a memo dated June 21, 1985, two days after Crum & Forster signed the Wellington Agreement, explaining why the company had signed despite its reinsurance concerns. Heap states:

> Crum and Forster originally subscribed to this Agreement on condition that there was an acceptable level of support by reinsurers, and I will describe the grounds on which this condition was seen to be satisfied before we actually executed the final Agreement.
>
> . . . . .
>
> It was not expected that there would be unanimity by reinsurers in acceptance of the Agreement, nor was it expected that any reinsurers would be willing to sign a blank check for recoveries on asbestos-related claims, but it was necessary that insurers attain an acceptance by reinsurers of the basic principles of the Agreement and agree that payments made by the Facility would be seen to be good payments for the purpose of reinsurance recoveries. *It was always understood that*

*reinsurance recoveries for facility claims payments would be subject to the terms and conditions of the treaty or certificate language, and it is understood that with or without the Facility there will inevitably be differences of opinion between insurers and reinsurers on . . . coverage issues.*

(Appendix 7 to Cigna Re's Support Brief, Memo of June 21, 1985, at 1.) (emphasis added.)

Appendix D of the Wellington Agreement specifically requires each producer and insurer who subscribes to the Agreement to execute a "Schedules Certification" for each affected policy within twenty (20) days of becoming a signatory of the agreement. A signatory's failure to so execute such a scheduling document within the 20–day period "shall be deemed an assent to and valid execution of the Schedules in question by such signatory." (*Id.* at 38.)

North River under Appendix D had the option of scheduling each Owens–Corning policy as either a "G" form policy (one that pays defense costs, or "allocated expenses," beyond policy limits), an "H" form policy (one that pays allocated expenses within the policy limits), or an "I" form policy (one that does not pay allocated expenses at all). (*Id.* at 38–39.) As North River and Owens–Corning both signed the Wellington Agreement on June 19, 1985, each party's 20–day scheduling period ended on July 9, 1985.

More than a month before even signing Wellington, on April 15, 1985, Owens–Corning sent an insurance schedule to North River's parent company, Crum & Forster, showing that it had scheduled the policies as "G," paying expenses in addition to policy limits. (*See* Appendix 9 to CIGNA Re's Support Brief.) On June 28, 1985, Owens–Corning reaffirmed its "G" policy form designation for the policies. (*See id.,* Appendix 10.)

North River decided not to execute the scheduling certificate. Instead, on July 2, 1985 its parent company, Crum & Forster, sent a letter to Owens–Corning, attaching a copy of the schedule Owens–Corning had sent to Crum & Forster. The letter began by stating that "[a]ttached is the schedule of coverage provided by the Crum and Forster

Organization and is stated to the best of our knowledge at this time." (*Id.,* Appendix 11.) However, the letter then contradictorily stated on page 2 that "a final determination re any Policy Form has not been made." (*Id.*)

In March 1987, Owens–Corning called upon North River to pay defense costs under the policies. North River refused, on the grounds that the policies did not cover defense costs. The parties submitted their dispute to the procedures mandated by the Wellington Agreement. Appendix C of the agreement provides for alternative dispute resolution ["ADR"] of asbestos-related controversies. (*Id.,* Appendix 8, at 28.)

In the first phase of the ADR process, the dispute first went before Dean John Feerick of Fordham Law School, designated as a "neutral" under the agreement, for non-binding mediation. Owens–Corning made three arguments in favor of North River paying defense costs: (1) North River had waived its right to contest the scheduling of the policies; (2) North River in withholding defense cost payments had acted in bad faith; and (3) the policies themselves, in light of Section XI's presumption, did not expressly exclude defense costs. Dean Feerick advised Crum & Forster that it "had a winner on the waiver claim [and] on the bad faith issues, but that [it] had a difficult time and a difficult case on the policy form issues." (*Id.,* Appendix 12, at 293–94, Testimony of Roger L. Prickett, Crum & Forster vice-president for environmental claims.) He also suggested that Crum & Forster settle with Owens–Corning by designating the policies as "H" form, paying defense costs within indemnity limits. (*Id.* at 295.)

North River and Owens–Corning did not settle, however. The matter entered the so-called "Proceeding" phase of the Wellington dispute resolution process. A memorandum to the file, dated January 29, 1988, written by George B. Luteran, a senior claims specialist for Crum & Forster, summarized a meeting Luteran had attended the previous day to discuss the dispute with Crum & Forster in-house counsel Bradford Rich, Esq., Prickett and George Hardin, Esq., outside counsel from Bumgardner, Hardin & Ellis of Spring-

field, N.J. That memo states, in relevant part:

> A meeting was held on 1–28–88 ... to discuss [the Owens–Corning dispute and a related dispute involving PPG Industries]. ... Discussion centered as to whether it might be possible to negotiate a compromised settlement with each of these insureds. *However, if we were to compromise on the allocated costs issue we would have an extremely difficult time in recovering any money spent for such costs from our reinsurers.* The only choice we have in the matter is to go forward to ADR. ...
>
> . . . . .
>
> Part of the strategy in going to ADR will be to ask that the findings be limited to whether our policies are G, H or I with no opinion or reasons for such a finding.
>
> . . . . .

(Appendix 14 to CIGNA Re's Opposition Brief.) (emphasis added.)

Crum & Forster's manager of reinsurance accounting, Steven A. Falk, in September 1988 sent a letter to "Reinsurers at Interest," noting that Dean Feerick had recommended a settlement that "will require the payment of some portion of Owens–Corning's allocated expenses (i.e. defense expenses) in addition to policy limits." (*Id.,* Exhibit 14.) This characterization, however, contradicts Prickett's deposition testimony that Dean Feerick had recommended that the parties agree to settle for an "H" form designation, which would allow payment of defense costs, but within policy limits. (*See* Appendix 12 to CIGNA Re's Support Brief, at 295.)

After extensive document discovery, numerous depositions and several days of trial, an arbitrator designated under the Wellington Agreement, retired United States District Court Judge H. David Hermansdorfer, issued his opinion on July 26, 1989. Judge Hermansdorfer's decision has three sections. In Part A, he ruled that North River through its failure to schedule the policies had waived its right to contest payment of defense costs. In Part B, as an alternative ground for requiring North River to pay defense costs, the judge ruled that North River had failed to carry its burden under Section XI to prove

that the policies expressly excluded defense costs. In Part C, the judge ruled that North River had not acted in bad faith in regard to Owens–Corning. (Judge Hermansdorfer's Opinion is attached as Appendix 1 to CIGNA Re's Support Brief.)

North River, through Crum & Forster, notified its reinsurers of the unfavorable ADR result. By letter dated August 3, 1989, again addressed to "Reinsurers-at-interest," Dennis C. Gibbs of Crum & Forster asserted:

> . . . . .
>
> North River believes the arbitrator's interim determination was contrary to the facts presented and the applicable law. It is considering an appeal of these adverse rulings. If any reinsurer of North River on the [Owens–Corning] contracts has a position concerning whether North River should appeal from the arbitrator's ruling, an immediate advise is requested. North River will keep you advised of future developments.

(*Id.,* Appendix 17.)

North River initially did appeal the arbitrator's ruling, then dropped the appeal. CIGNA Re did not learn of the abandonment of the appeal until it received bills for the defense costs at issue. (*Id.,* Appendix 18, Testimony of James P. Jones, CIGNA Re's Director, Claims & Loss Department, at 242–43.) An internal memorandum prepared by Crum & Forster's in-house counsel at the time, Bradford Rich, concluded that although, "[t]he issues presented are difficult, ... on balance we conclude that the risks of appeal outweigh the potential benefit." (Appendix 15 to CIGNA Re's Opposition Brief, at 1.) The Rich memo asserted that the prospects for a Wellington three-judge appellate panel overturning the waiver portion of Judge Hermansdorfer's opinion were especially poor. Rich noted:

> ... Wellington is very specific in the execution requirements [in Appendix D]—with which we did not comply. The penalty is also explicit—one is deemed to have agreed with the producer if there is a

failure of execution. This is a very difficult argument for us to overcome.

(*Id.*, at 3.)

James P. Jones, CIGNA Re's Claims & Loss Department Director, visited Crum & Forster's environmental claims office in Warren, N.J. in August 1990 and in October 1990. However, he was able to make only a quick inspection of the ADR opinion of Judge Hermansdorfer. (*See* Appendix 27 to CIGNA Re's Opposition Brief, at 239–40.) On March 18, 1991, eleven days before North River filed this lawsuit, and after several requests for the opinion made by CIGNA Re, North River mailed CIGNA Re a complete copy of the ADR opinion, as well as the Rich memorandum discussing the merits of an appeal. (*Id.*, Appendix 31.) CIGNA Re had decided to wait until it received a full copy of the ADR opinion, before deciding whether to formally deny North River's request for defense cost payments. (*Id.*, Appendix 32, Testimony of Dale A. Diamond, at 57–58.)

## II. DISCUSSION

### A. Scope of the Complaint

Before reaching the merits of the two summary judgment motions, the Court must address two threshold issues: (1) which underlying North River policies and which CIGNA Re certificates are at issue; and (2) which state's or states' law applies in this diversity action.

For the following reasons, the Court concludes that only the three underlying North River policies and the four facultative reinsurance certificates specifically mentioned in the complaint are at issue. The complaint refers only to underlying policies XS–3619, XS–4073, and XS–4423 and to reinsurance certificates FRC–01817, FRC–016186, FRC–019062, and V01078.

CIGNA Re, however, has apparently issued three other reinsurance certificates to North River, involving two additional underlying policies. Exhibit A to the Steven A. Falk Affidavit identifies those additional documents as underlying policy 522–000410, reinsured under certificate FRC–024353, and underlying policy 522–000411, reinsured under certificates V01493 and 7003952.

North River by letter dated June 4, 1992 attempted to work out a stipulation with CIGNA Re concerning the additional policies and certificates. CIGNA Re declined to give its consent to what, in effect, would be an amendment of the complaint under Fed. R.Civ.P. 15(a). North River has never filed a motion under Rule 15(a) asking the Court's permission to amend. Nor has it provided the Court with copies of these additional policies and reinsurance certificates. Therefore, the Court will consider only those three policies and four reinsurance certificates which North River specifically named in the complaint.

### B. Choice of Law

 North River and CIGNA Re have signed a joint stipulation and order, dated July 7, 1993, that states:

[North River] and [CIGNA Re] hereby stipulate and agree that for the purposes of this action:

1) New York law governs the interpretation and construction of the reinsurance certificates, including the reinsurance issues that have arisen thereunder that are the subject of this dispute; and

2) In an insurance coverage contest between North River and [Owens–Corning], Ohio law would govern the interpretation and construction of the insurance policies North River had issued to Owens–Corning.

(Joint Choice of Law Stipulation and Order at 1.)

 In a diversity case, a federal district court must apply the choice of law rules of the state in which it sits. *Klaxon Co. v. Stentor Manufacturing Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). New Jersey courts honor contractual choice of law provisions as long as the public policy of the forum state is not violated. *See Citibank, N.A. v. Errico*, 251 N.J.Super. 236, 243, 597 A.2d 1091 (App.Div.1991). For the following reasons, the Court concludes that the joint stipulation does not violate New Jersey public policy.

The general rule in New Jersey is that the law of the place of the contract governs the

choice of law, especially when that place has a "significant relationship ... with the parties and the transaction." *State Farm Mut. Automobile Ins. Co. v. Estate of Simmons,* 84 N.J. 28, 37, 417 A.2d 488 (1980). By applying Ohio law in interpreting and construing the underlying Owens–Corning–North River policies, and by applying New York law in interpreting and construing the North River–CIGNA Re reinsurance certificates, this Court would not offend those principles.

Ohio has a significant relationship with the parties and the underlying Owens–Corning–North River insurance policy because Owens–Corning has its principal place of business in Toledo, Ohio. New York has a significant relationship with the parties and the reinsurance certificates at issue. Those certificates were purchased for North River by L.W. Biegler Co., which was located in New York City at the time, (*see* Steven A. Falk Affidavit at 3.), and CIGNA Re's predecessor in interest, the INA Insurance Company, countersigned the reinsurance certificates in New York. (*See* Appendix 5 to CIGNA Re's Brief in Support of Summary Judgment.)

North River argues, nevertheless, that the Court should not apply Ohio law because "the underlying insurance policies are irrelevant to the court's choice of law determination" and the Court need only look to the reinsurance certificates to determine the rights and obligations of CIGNA Re and North River. (North River's Opposition Brief at 9.) The Court would agree with that statement, had all four reinsurance certificates not included a "following form" clause, specifically providing that CIGNA Re's contractual obligations, unless otherwise stated, "shall be subject in all respects *to all the terms and conditions of the [North River] policy.*" (*See* Appendix 5A of CIGNA Re's Support Brief.) (emphasis added.) This clause, therefore, incorporates by reference into the reinsurance certificate the terms of the underlying policy. *See Unigard Sec. Ins Co. v. North River Ins. Co.,* 762 F.Supp. 566, 595 (S.D.N.Y.1991), *aff'd in part and rev'd in part on other grounds,* 4 F.3d 1049 (2d Cir. 1993). ["*Unigard I*"]

## C. The Summary Judgment Motions

Summary judgment is appropriate only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). Whether a fact is material is determined by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). An issue involving a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Healy v. New York Life Ins. Co.,* 860 F.2d 1209, 1219 n. 3 (3d Cir. 1988), *cert. denied,* 490 U.S. 1098, 109 S.Ct. 2449, 104 L.Ed.2d 1004 (1989).

The moving party has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Where the moving party satisfies this requirement, the burden shifts to the nonmoving party to present evidence that there is a genuine issue for trial. *Id.* at 324, 106 S.Ct. at 2553. Once the moving party has carried its burden of establishing the absence of genuine issues of material fact, the nonmoving party "may not rest upon mere allegations or denials" of its pleading, Fed.R.Civ.P. 56(e), but must produce sufficient evidence to reasonably support a jury verdict in its favor, *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510, and not just "some metaphysical doubt as to material facts." *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) *aff'd on remand* 807 F.2d 44 (3d Cir), *cert. denied* 481 U.S. 1029, 107 S.Ct. 1955, 95 L.Ed.2d 527 (1987).

In deciding a summary judgment motion, "the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson,* 477 U.S. at 249, 106 S.Ct. at 2510. In determining whether any genuine issues of material fact exist, the Court must resolve "all inferences, doubts, and issues of credibility ... against

the moving party." *Meyer v. Riegel Products Corp.*, 720 F.2d 303, 307 n. 2 (3d Cir. 1983), *cert. dismd.*, 465 U.S. 1091, 104 S.Ct. 2144, 79 L.Ed.2d 910 (1984) (*citing Smith v. Pittsburgh Gage & Supply Co.*, 464 F.2d 870, 874 (3d Cir.1972)).

### 1. CIGNA Re's Motion

■ CIGNA Re moves for summary judgment, asserting that no genuine issues of material fact exist and that, as a matter of law, it is not obligated to reimburse North River for the defense costs at issue. On the other hand, North River argues that both the "follow the fortunes" and the "following form" clauses in the reinsurance certificates require CIGNA Re to pay defense costs, even those incurred in excess of the certificate limits. Even if those clauses do not obligate CIGNA Re, North River contends, CIGNA Re by its conduct has waived its right to contest payment.

As discussed below, the Court grants CIGNA Re's summary judgment motion for two reasons: (1) defense costs are not a type of risk reinsured; and (2) North River violated its duty of utmost good faith to CIGNA Re. The Court, however, will not address the implications on this case, if any, of the decision in *Bellefonte Reinsurance Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 910, 912–13 (2d Cir.1990), which concerns whether a reinsurer must pay costs exceeding the indemnity cap of the reinsurance certificates. CIGNA Re has never raised this defense. Subsequent to filing the Motion for Summary Judgment, CIGNA Re, in response to the Court's inquiry, confirmed that it "is not asserting in this case that its certificate limits, *per se,* are a bar to the relief sought by North River." (Letter to the Court of September 9, 1993, at 5.)

The Court will now address the parties' arguments concerning the effects, respectively, of the "follow the fortunes" clause, the "following form" clause, and the doctrines of waiver and estoppel, on CIGNA Re's obligation to pay defense costs.

### (A) "Follow the Fortunes" Clause

■ The "follow the fortunes" clause in each certificate states, with slight variations

not relevant here, that "[a]ll claims involving this reinsurance, when settled by [North River], shall be binding on [CIGNA Re], which shall be bound to pay its proportion of such settlements and in addition thereto ... its proportion of expenses ..." (*See, e.g.,* Appendix 5A to CIGNA Re's Support Brief.) Not surprisingly, North River construes this clause much more broadly than does CIGNA Re.

North River applies a rather literal approach to the construction of the "follow the fortunes" clause. It asks the Court to treat the clause as though it literally requires a reinsurer to share any settlement fortunes, good or bad, of the reinsured. As North River had the "bad fortune" of losing the ADR dispute, "CIGNA must share in North River's fortunes: CIGNA must pay its share of defense costs." (North River Support Brief at 25.) Only the reinsured's bad faith, North River contends, would relieve a reinsurer under such circumstances. (*Id.* at 31.)

North River also makes a policy argument in favor of an especially broad construction of the "follow the fortunes" clause, asserting that the clause is intended to avoid repeated litigation between reinsurer and reinsured. It suggests that CIGNA Re could have protected its interests by associating with North River in the ADR dispute:

> CIGNA's refusal to accept the finality of Judge Hermansdorfer's opinion has precipitated the kind of unnecessary and wasteful litigation that the follow the fortunes clause in its reinsurance certificates was intended to prevent.... CIGNA, having stood silent throughout the arbitration (despite repeated requests for advice), should not now be permitted to second-guess either North River's decision to pay or the merits of Judge Hermansdorfer's opinion.

(*Id.* at 29.)

The problem with North River's argument is that it sidesteps certain contractual limitations, well established under New York law, on the scope of the "follow the fortunes" clause. As the Second Circuit recently observed in an analogous context: "The fact that North River was compelled by arbitration to pay the disputed expenses does not

alter the terms of the bargained-for agreement." *Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049 at 1071 (2d Cir.1993) [ *"Unigard II"* ].

In fact, in light of these contractual limitations, the Court believes that the phrase "follow the fortunes" itself is a misnomer. The British term, "follow the settlements," more accurately characterizes the effect of such a clause. *See, e.g., Charman v. Guardian Royal Exchange Assurance*, [1992] 2 Ll. Rep. 607 (Q.B.) (discussing legal implications of "follow the settlements" clause). The clause itself states that "all claims *involving this reinsurance*, when *settled* by [North River], shall be binding on [CIGNA Re]...." (emphasis added.) It does not state that CIGNA Re shall follow in the fortune, good or bad, of any litigation involving the underlying policy.

North River's suggestion that CIGNA Re must blindly "follow the fortune" of its ADR litigation with Owens–Corning ignores the three contractual limitations imposed by the reinsurance certificates themselves:

First, these certificates only reimburse North River for the type of loss reinsured. *See American Ins. Co. v. North Am. Co. for Property and Cas. Ins.*, 697 F.2d 79, 81 (2d Cir.1982). Second, CIGNA Re is only obliged to follow the fortunes of North River up to the limit agreed upon by the parties in assenting to the reinsurance certificate contract. *See Bellefonte Reins. Co. v. Aetna Cas. and Sur. Co.*, 903 F.2d 910, 912–14 (2d Cir.1990). Third, a "follow the fortunes" clause binds CIGNA Re only where North River has made the settlement in good faith, i.e., honestly and with all proper and businesslike steps. *See American Marine Ins. Group. v. Neptunia Ins. Co.*, 775 F.Supp. 703, 708–09 (S.D.N.Y.1991), *aff'd without opinion for substantially the same reasons stated below*, 961 F.2d 372 (2d Cir.1992).

### (1) Type of Loss Reinsured

The "following form" clause in each reinsurance certificate incorporates by reference the terms and conditions of the underlying policies, unless the certificate provides otherwise. *See Unigard I*, 762 F.Supp. at 595. In other words, the risks insured under the underlying policies are, absent certificate language to the contrary, also covered by the reinsurance certificate.

The "follow the fortunes" clause, however, broadens this reinsurance coverage. The clause requires a reinsurer to indemnify "for payments reasonably within the terms of the original policy, even if not technically covered by it." *Christiania General Ins. Corp. v. Great Am. Ins. Co.*, 979 F.2d 268, 280 (2d Cir.1992). Courts applying New York law use the word "arguably" interchangeably with "reasonably" in this context. *See, e.g., Mentor Ins. Co. (U.K.) Ltd. v. Brannkasse*, 996 F.2d 506, 517 (2d Cir.1993). Therefore, as the Second Circuit recently explained:

> ... The follow-the-fortunes principle does not change the reinsurance contract; it simply requires payment where the [reinsured's] good-faith payment is at least arguably within the scope of the insurance coverage that was reinsured.

*Id.*

As mentioned above, under the "following form" clause the scope of the coverage reinsured by CIGNA Re is determined by the terms and conditions of the underlying policies. Under the "follow the fortunes" clause, therefore, CIGNA Re must reimburse North River for any settlement "arguably within the scope" of the coverage of those underlying policies. However, there are contractual limits to the kinds of risks the "follow the fortunes" clause covers. As one New York court explained:

> .... It would be an unwarranted and indeed tortured construction of [the "follow the fortunes"] clause to hold a reinsurer bound, for example, to pay if the prime insurer paid monies to its insured on a claim completely without the scope of the policy and not in good faith....

*Insurance Co. of North America v. U.S. Fire Ins. Co.*, 67 Misc.2d 7, 322 N.Y.S.2d 520, 523 (Sup.Ct.1971) *order aff'd* 42 A.D.2d 1056, 348 N.Y.S.2d 122 (App.Div.1973).

As previously discussed, Ohio law applies to coverage disputes between North River and Owens–Corning concerning the underlying policies. Therefore, the Court must construe these insurance policies, as Ohio courts

do, in accordance with general contract principles. *See Rhoades v. Equitable Life Assur. Soc. of U.S.*, 54 Ohio St.2d 45, 47, 374 N.E.2d 643, 8 O.O.3d 39 (1978). Where the policy provisions are clear and unambiguous, the Court "cannot enlarge the contract. by implication so as to embrace an object distinct from that originally contemplated by the parties." *Id.* The Court must give the words used in an insurance contract their commonly accepted meanings, unless that would lead to an absurd result. *Olmstead v. Lumbermans Mut. Ins. Co.*, 22 Ohio St.2d 212, 216, 259 N.E.2d 123, 51 O.O.2d 285 (1970).

North River has proffered no evidence that the underlying policies employed terms having a special meaning within the insurance industry. *See Alexander v. Buckeye Pipe Line Co.*, 53 Ohio St.2d 241, 247–48, 374 N.E.2d 146, 7 O.O.3d 403 (1978). Therefore, the Court should not examine extrinsic evidence, absent any ambiguity in the policy terms. *Rose v. New York Life Ins. Co.*, 127 Ohio St. 265, 273, 187 N.E. 859 (1933). Terms are ambiguous where they are capable of two, alternative, ordinary and usual meanings. *Cf. Munchick v. Fidelity & Cas. Co. of New York*, 2 Ohio St.2d 303, 209 N.E.2d 167, 31 O.O.2d 569 (1965).

In reading the policy language, the Court will also observe these general contract principles adopted by the Ohio Supreme Court:

> The meaning of a contract is to be gathered from a consideration of all its parts, and no provision is to be wholly disregarded as inconsistent with other provisions unless no other reasonable construction is possible.

> A special provision will be held to override a general provision only where the two cannot stand together. If reasonable effect can be given to both, each is to be retained.

*Karabin v. State Automobile Mut. Ins. Co.*, 10 Ohio St.3d 163, 167, 462 N.E.2d 403, 10 O.B.R. 497 (1984) (quoting *German Fire Ins. Co. v. Roost*, 55 Ohio St. 581, 585, 45 N.E. 1097 (Ohio 1897)).

The Court will examine the plain language of the form used in the underlying policies to determine whether it is ambiguous. If that language, as a matter of Ohio law, unambigu-

ously provides that the policies do not pay defense costs, then, as a matter of New York law, under the "follow the fortune" clause those costs are not "arguably within the scope" of the risks reinsured by CIGNA Re. *See American Ins. Co.*, 697 F.2d at 80–81.

Paragraph 1 of the policy provides that North River "hereby indemnifies [Owens–Corning] against ultimate net loss." "Ultimate net loss" is defined in Paragraph 13 as excluding all "Costs." "Costs," under Paragraph 14, specifically include "legal expenses." (*See, e.g.,* Appendix 2 to CIGNA Re's Support Brief.) Therefore, "ultimate net loss" excludes legal expenses, reading those three paragraphs together.

Paragraph 8 provides that "at no time shall [North River] be called upon to assume charge of the settlement or defense of any claims made or suits brought or proceedings instituted against [Owens–Corning]." Paragraph 9 provides that "[Owens–Corning] shall be solely responsible for the investigation, settlement, defense and final disposition of any claim...." (*Id.*)

Paragraph 8, however, also gives North River the right to consent to paying "costs." It provides that:

> ... [North River] shall have the right and shall be given the opportunity to associate with [Owens–Corning] or its underlying insurer or insurers, or both, in the control, defense and/or trial of any claims, suits or proceedings which, in the opinion of [North River], involves or appears reasonably likely to involve [North River]....

(*Id.*)

Paragraph 15, if read out of context, could be construed as imposing an obligation on North River to pay defense costs. In the context of Paragraphs 8 and 9, however, Paragraph 15 unambiguously applies only when North River has given its consent to Owens–Corning incurring defense costs. Paragraph 15 states that "Costs incurred by [Owens–Corning], with the written consent of [North River], shall be apportioned as follows: ..." It then details a formula under which North River would pay a portion of those costs, should it consent. (*Id.*)

Having just construed the policy terms under Ohio law as unambiguously providing that North River is not obligated to pay defense costs, the Court concludes that CIGNA Re, as a matter of New York law, need not reimburse North River for those costs under its "follow the fortunes" clause. *Cf. American Ins. Co.*, 697 F.2d at 80–81. (even where underlying policy terms were ambiguous on the subject, extrinsic evidence showed reinsurer was not bound to reimburse reinsured for punitive damages).

Although the Court has not found, nor have the parties identified, any published decision under Ohio law which construes substantially similar policy provisions, a recent unpublished decision in the Northern District of Ohio has examined the provisions of one of the very policies at issue here, XS–3619, and concluded that it unambiguously did not obligate the insurer to pay defense costs. *Affiliated FM Ins. Co. v. Owens–Corning Fiberglas Corp.*, 1992 WL 404399 (N.D.Ohio Sept. 16, 1992), *reprinted in* 6 Ins.Litig.Rep. at B–1 (Mealey's Oct. 6, 1992).

Indeed, cases from numerous other jurisdictions support the conclusion that these policy terms unambiguously do not provide for the payment of defense costs. *See, e.g., Chubb/Pacific Indemnity Group v. Ins. Co. of North Am.*, 188 Cal.App.3d 691, 233 Cal. Rptr. 539, 543 (App. 2 Dist.1987); *Crown Center Redevelopment Corp. v. Occidental Fire & Cas. Co. of North Carolina*, 716 S.W.2d 348, 357 (Mo.App.1986); *Cornhuskers Agricultural Ass'n v. Equitable General Ins. Co.*, 223 Neb. 618, 392 N.W.2d 366 (1986); *Chicago & Eastern Ill. R.R. Co. v. Reserve Ins. Co.*, 99 Ill.App.3d 433, 54 Ill.Dec. 564, 425 N.E.2d 429 (1981); *Commercial Union Ins. Co. v. Adams*, 231 F.Supp. 860, 865 (S.D.Ind.1964). Furthermore, standard clauses, if possible, should get uniform interpretation. *See Unigard II*, at 1071.

The Ohio case relied upon by North River, *Phoenix Phase I Assocs. v. Ginsberg, Guren & Merritt*, 27 Ohio App.3d 240, 500 N.E.2d 365, 27 O.B.R. 281 (1985), is not. on point. The court there did not address the issue of whether the policy at issue covered defense costs. Assuming that policy did cover defense costs, the court considered instead

whether, in light of events after the initial complaint, there was an "occurrence" sufficient to trigger the defense obligation and whether there had been a sufficient "tender" of defense to the excess carrier. *Id.* 500 N.E.2d at 366–67.

██ North River's position during the ADR proceedings was that the policies unambiguously did not provide for payment of defense costs. (*See* Appendix 3 to CIGNA Re's Support Brief, at 723, Testimony of Roger Quigley, and at 747–48, Testimony of John Intondi.) Nor can North River rely on the reasoning behind Judge Hermansdorfer's ADR opinion to create ambiguity in the policy language. Under Ohio law, the mere fact that a judicial body in another jurisdiction has given a different construction to a virtually identical contract provision does not make that provision ambiguous as a matter of law. *See Park–Ohio Industries, Inc. v. Home Indemnity Co.*, 975 F.2d 1215, 1220 (6th Cir.1992). In any event, for the reasons discussed below, the Court concludes that the ADR opinion did not construe the underlying policies themselves, but materially relied upon Section XI and Appendix D of the Wellington Agreement.

North River also argues that, under Paragraph 15, the underlying policies "*always* had the potential, as drafted, to pay defense costs." (North River's Support Brief at 9–10 n. 11.) If North River had given such consent, it argues, then CIGNA Re would be bound to reimburse it for its share of defense costs.

The Court agrees with North River that the policies as issued had the potential to pay defense costs. But that potential is realized only when North River also exercises its right, expressed in Paragraph 8 of the policies, to associate with Owens–Corning in the defense of claims reasonably likely to involve North River. In short, Paragraph 8 shows that North River would give its consent to paying a share of defense costs only where it also exercised its right to participate in the defense of a claim. The policies do not contemplate North River consenting to paying a share of defense costs, without first agreeing to associate in the defense.

The Court, therefore, concludes that defense costs, as a matter of Ohio and New York law, were not among the type of risks CIGNA Re agreed to reinsure.

### (2) Bad Faith

■ Even if the defense costs were arguably within the scope of coverage of the underlying policies, the "follow the fortunes" clause would bind CIGNA Re only where North River has acted with the good faith and fair dealing implied in all contracts. This duty is often expressed in a reinsurance context as the duty of *uberrima fides,* or utmost good faith. *See Unigard II,* at 1065–66. This duty has also been described as requiring a reinsured to act "honestly and [with] all proper and businesslike steps in making the settlement." *American Marine,* 775 F.Supp. at 708, quoting *Insurance Co. of Africa v. Scor (U.K.) Reins. Co.,* [1985] 1 Ll.Rep. 312, 330 (C.A.).

The Second Circuit recently explained the rationale behind the duty of good faith of a reinsured to the reinsurer:

> . . . [B]ecause information regarding risks lies with the ceding insurer, the reinsurance market depends upon a high level of good faith to ensure prompt and full disclosure. Absent such disclosure, reinsurers would have to duplicate actuarial and claims-handling efforts of ceding insurers, and reinsurance would become unavailable. Court should thus adopt information-forcing default rules based on the good faith the reinsurance market demands.

*Unigard* II, at 1066.

■ The reinsurer has the burden of proving that the reinsured has not acted in good faith. *American Marine,* 775 F.Supp. at 708, citing *Insurance Co. of Pennsylvania v. Grand Union Ins. Co.,* [1990] 1 Ll.Rep. 208 (Hong Kong C.A.). The reinsurer must prove (1) that the reinsured acted with gross negligence or recklessness, and (2) that the reinsurer as a result has suffered "prejudice," defined as "economic injury." *Unigard* II, at 1068–69.

In describing the type of conduct which might meet the "gross negligence or recklessness" standard, in the context of whether a reinsured has provided adequate notice of loss to its reinsurer, the *Unigard* II court explained:

> If a ceding insurer deliberately deceives a reinsurer, that deception is of course bad faith. However, if a ceding insurer has implemented routine practices and controls to ensure notification to reinsurers but inadvertence causes a lapse, the insurer has not acted in bad faith. *But if a ceding insurer does not implement such practices and controls, then it has willfully disregarded the risk to reinsurers and is guilty of gross negligence.* A reinsurer, dependent on its ceding insurer for information, should be able to expect at least this level of protection, and, if a ceding insurer fails to provide it, the reinsurer's late loss notice defense should succeed.

*Id.* at 1069. (emphasis added.)

■ As just described, a reinsured may violate the duty of utmost good faith by failing to provide notice of loss to the reinsurer. It may also violate that duty through failure to settle a claim "honestly and [with] all proper and businesslike steps." *American Marine,* 775 F.Supp. at 708. For the following reasons, the Court concludes that North River violated its duty of utmost good faith to CIGNA Re by gross negligence in: (1) failing to recognize how signing the Wellington Agreement materially expanded the defense obligation under the Owens–Corning policies, and (2) triggering the strict penalty in Appendix D of the agreement by failing to schedule the policies within the 20–day period. These two acts of gross negligence also constitute a material breach of the re-insurance certificates which each mandated that CIGNA Re consent to any modification of the risks re-insured. See e.g. Appendix 5B to CIGNA Re's Support Brief, Section 11.

The Court concludes that the evidence is uncontroverted that Crum & Forster, North River's parent company, before signing the Wellington Agreement was not aware of the two significant ways in which that agreement would change the underlying Owens–Corning policies: first, through Appendix D's strict scheduling requirements, and second, through the Section XI presumption that defense costs would be included in the policies.

Not being aware itself of those changes, Crum & Forster could not, and did not, inform CIGNA Re, before signing the agreement.

Ian R. Heap, a Crum & Forster senior vice-president and key member of the company's team who analyzed the costs and benefits of signing the agreement, testified that his company did not review the various types of policies to see how the agreement might affect them. (Appendix 6 to CIGNA Re's Support Brief, at 69–70.) In particular, Heap was not aware of the effect the agreement might have on the Owens–Corning policies, nor even whether Owens–Corning would sign the agreement. (*Id.*, at 113, 118.)

Once it signed the agreement, North River and its decision makers again, as a matter of law, acted with gross negligence toward CIGNA Re, by failing to comply with the 20–day scheduling requirement of Appendix D. This failure automatically triggered a penalty which required North River to pay defense costs, whether or not North River's policies expressly excluded them.

To prove a violation of the duty of utmost good faith, however, CIGNA Re must do more than merely show gross negligence. It must also prove that it suffered prejudice, i.e., specific economic harm, as a result of the grossly negligent conduct. *Unigard* II, at 1068–69. For the following reasons, the Court concludes as a matter of law that CIGNA Re has proven such prejudice here.

In the context of a reinsured's failure to provide adequate notice of a claim, the *Unigard II* court concluded that the reinsurer to show prejudice must submit "actual proof that the results of the litigation would have been different." *Id.* (quotation omitted.) In this case, the Court concludes that, absent North River's gross negligence, the results of the ADR decision would have been different.

In his ADR opinion, Judge Hermansdorfer relied upon two alternate provisions of the Wellington Agreement: In Part A, he relied upon North River's waiver through failing to schedule the policies under Appendix D; In Part B, he relied upon the presumption in Section XI that policies pay defense costs unless they expressly provide otherwise. (Appendix 1 to Cigna Re's Support Brief.)

North River's gross negligence, in failing to recognize the implications of the defense cost presumption in Section XI on the scope of coverage under the Owens–Corning policies, resulted in economic prejudice, through Part B's holding that North River had failed to rebut that presumption and was liable for defense costs. North River's gross negligence, in failing to schedule the Owens–Corning policies, resulted in economic prejudice, through Part A's holding that North River had waived its right to contest payment of defense costs by failing to schedule the policies.

The Court recognizes that there are other areas in which North River may have violated its duty of utmost good faith. Because these areas involve disputed factual contentions, however, the Court will not rely upon them in granting summary judgment for CIGNA Re.

For example, there is evidence that during the ADR proceedings North River rejected a compromise settlement with Owens–Corning primarily because of reinsurance concerns. The memorandum of George B. Luteran, written a day after the January 28, 1988 Crum & Forster strategy session on the ADR, shows that the company may not have been acting in a proper and businesslike fashion toward reinsurers, including CIGNA Re. Luteran states that "if we were to compromise on the allocated [defense] costs issue we would have an extremely difficult time in recovering any money spent for such costs from our reinsurers." (Appendix 14 to CIGNA Re's Opposition Brief.) Later in that same memo, Luteran states that Crum & Forster in going to ADR would ask the arbitrator not to detail his reasons for concluding whether or not the policies paid defense costs. (*Id.*)

Furthermore, there is evidence North River did not accurately inform its reinsurers of the nature of the settlement offered. In Crum & Forster's September 1988 letter to "Reinsurers at Interest," claims accounting manager Steven A. Falk stated that the mediator had recommended a settlement that "will require the payment of some portion of

Owens–Corning's allocated expenses (i.e. defense expenses) in addition to policy limits." (*Id.*, Exhibit 14.) This characterization, however, contradicts Crum & Forster vice-president Roger Prickett's deposition testimony that the mediator had in fact recommended that the parties agree to settle for an "H" form designation, which would allow payment of defense costs, but within policy limits. (*See* Appendix 12 to CIGNA Re's Support Brief, at 295.)

The Court concludes, however, that the issue of North River's gross negligence in refusing to settle the ADR claim because of reinsurance concerns is a disputed factual one. Crum & Forster vice-president Roger Prickett has testified that North River was advised during the mediation session that Owens–Corning would not accept Dean Feerick's compromise. (Appendix 12 to CIGNA Re's Support Brief, at 296.)

Having decided to reject a settlement and pursue an arbitration proceeding, there is evidence that North River again acted with gross negligence by keeping CIGNA Re in the dark on key elements of that proceeding. James P. Jones, CIGNA Re's Claims & Loss Department Director, visited Crum & Forster's environmental claims office in Warren, N.J. in August 1990 and in October 1990. However, he was able to make only a quick inspection of the ADR opinion of Judge Hermansdorfer. (*See* Appendix 27 to CIGNA Re's Opposition Brief, at 239–40.) Significantly, North River did not provide CIGNA Re with a complete copy of the 31–page ADR slip opinion until March 18, 1991, less than two weeks before it filed this lawsuit. (*Id.*, Appendix 31.) Previously, North River had provided only the final two pages of the opinion, which does not detail the rationale behind it. (*Id.*, Appendix 28.)

The Court, however, cannot state as a matter of law that CIGNA Re suffered specific economic loss as a result of prejudice from any lack of notice concerning the ADR proceedings. As explained above, the Court concludes that, had CIGNA Re been able to associate in the ADR proceeding, it would not have changed the result, as North River was already bound to pay defense costs through its failure to schedule the policies under Appendix D.

After Judge Hermansdorfer released his ADR opinion on July 27, 1989, North River informed its reinsurers that it was considering an appeal and would keep reinsurers "advised of future developments." (Appendix 17 to CIGNA Re's Support Brief.) James P. Jones, CIGNA Re's claims handler directly responsible for the reinsurance claims at issue, testified that he had expected to be told of any decision to pursue the appeal or drop the appeal. (*Id.*, Appendix 18, at 191–94, 240–42.)

North River, however, dropped its appeal without informing CIGNA Re, even though one of its key decision makers, former Crum & Forster vice-president of reinsurance operations and special counsel, Thomas Warnke, testified that reinsurers should have been notified of that decision. (*Id.*, Appendix 19, at 90–91, 174.) CIGNA Re did not learn of the abandonment of the appeal until it received bills for the defense costs at issue. (*Id.*, Appendix 18, at 242–43.) However, the Court does not believe any economic prejudice resulted, because North River's failure to schedule the policies made a successful appeal very unlikely.

In conclusion of this issue, because defense costs were not a type of risk that was reinsured and because North River violated its duty of utmost good faith, CIGNA Re is not obligated, under the "follow the fortunes" clause, to reimburse North River for defense costs under the Owens–Corning policies.

### (B) "Following Form" Clause

██ North River also argues that the "following form" clause in the reinsurance certificates requires CIGNA Re to pay the defense costs involving the Owens–Corning policies. That clause states that, unless otherwise provided, the reinsurance certificate shall be subject "in all respects to all the terms and conditions" of the underlying policies. (*See, e.g.,* Appendix 5A to CIGNA Re's Support Brief.)

North River summarizes its rationale as follows:

... [U]nder the "following form" clause in CIGNA's reinsurance certificate, CIGNA is bound by the terms of the underlying insurance policies. Judge Hermansdorfer ruled as a matter of law that the terms of the underlying policies require North River to pay defense costs in addition to indemnity limits. CIGNA is bound by that ruling.

(North River's Support Brief at 25.)

The Court finds two problems with North River's rationale: First, CIGNA Re is not bound by the ADR opinion. Second, Judge Hermansdorfer in that opinion did not rule as a matter of law that the terms of the underlying policies required North River to pay the defense costs. Rather, he ruled that the Wellington Agreement, particularly Appendix D and Section XI, required payment of those costs.

The ADR decision was rendered by Judge Hermansdorfer as an arbitrator under the Wellington Agreement. The two signatories to that agreement were Owens–Corning and North River. CIGNA Re did not sign the Agreement or assent to the arbitration. North River suggests that CIGNA Re is somehow indirectly bound by the agreement. It notes, at footnote 9 on page 7 of its support brief, that "CIGNA's parent company is a signatory to the Wellington Agreement." However, North River has not indicated how CIGNA Re's parent's signing of the Wellington Agreement could bind CIGNA Re. *See, e.g., In re Thomson McKinnon Securities, Inc.,* 149 B.R. 61, 73 (Bankr. S.D.N.Y.1992) ("The concept of reverse corporate veil piercing to hold a subsidiary liable for obligations of its parent is a rare occurrence.")

Nor does North River accurately characterize the two alternative grounds, that Judge Hermansdorfer gives in the ADR opinion for holding that North River must pay defense costs for Owens–Corning. North River suggests that the opinion relies, not on the Wellington Agreement, but exclusively on the underlying policy language. The Court disagrees, finding that the opinion relies materially on the Wellington Agreement.

At page 2, under the heading "Jurisdiction," the opinion states:

The sole authority underlying this proceeding lies in the voluntary subscription of the parties to the Wellington Agreement and their subsequent submission of issues for arbitration pursuant to said Agreement. The further conclusion is stated that this tribunal has jurisdiction over the parties and issues solely within the scope of the Wellington Agreement and not otherwise.

(Appendix 1 to CIGNA Re's Support Brief, at 2.)

In Part A, Judge Hermansdorfer concluded that North River waived its right to contest Owens–Corning's designation of the policies as "G," policies, paying defense costs in excess of policy limits, because it failed to execute the scheduling certification within the required 20–day period under Appendix D. The judge found that this failure "was a deliberate course of conduct adopted by North River after consultations at upper levels of management." (*Id.* at 14.)

In Part B, Judge Hermansdorfer began by explaining the effect made by the Wellington Agreement on the Owens–Corning policies, identified as "Joint Exhibit 5:"

The language of Joint Exhibit 5, by operation of the Wellington Agreement, "[is] subject to the terms and conditions of the Agreement to which [it] shall be attached and form a part thereof." ([Wellington] Agreement, Appendix D, p. 44) Upon satisfaction of the Appendix D requirements, one document survived, the Agreement, and Appendix C of the Agreement is addressed to disputes arising within the scope of the Agreement. Thus, Joint Exhibit 5 is a constituent part of the Wellington Agreement and cannot be considered as separate and apart from the Agreement or as not being controlled by the terms and conditions of the Agreement.

(*Id.* at 16.) The judge then explained he would not use the cases cited by each party interpreting the Owens–Corning policy language because "this proceeding is unique in that both the language of the policy and the language of the Wellington Agreement are material to the interpretation to be made." (*Id.* at 17.) In particular, the judge used the

Section XI presumption that defense costs were payable, unless the policy expressly provide otherwise. (*Id.* at 19–20.)

To the extent that the judge considered the language of the Owens–Corning policies themselves, he relied upon expert testimony at trial that, he concluded, established that the phrase "with the written consent of [North River]" in Paragraph 15 of the policy was a term of art in the industry. The judge found that, within the industry, the insurer may not unreasonably withhold such consent. (*Id.* at 20–22.) Therefore, he concluded that North River had not overcome the presumption in Section XI of the agreement, because defense costs were not expressly excluded. (*Id.* at 22–23.)

As previously mentioned, however, North River does not believe the Owens–Corning policies are ambiguous nor that the language in them has a special meaning within the industry. Nor does CIGNA Re suggest the language has a special meaning. Both parties assert that the Owens–Corning policies are plain on their face.

In arguing that Judge Hermansdorfer ruled that defense costs are payable under the Owens–Corning policies themselves, North River cites certain language describing that ADR opinion which appeared in *Unigard I*, 762 F.Supp. at 594–95:

> ... There is no question here as to whether North River's payment of expenses in excess of policy limits was done in good faith: North River was obligated to do so by the arbitration of July 1989. As that arbitration established that such expenses were required by the terms of North River's policy with Owens–Corning, the "following form" clause requires Unigard [the reinsurer] to pay its share of those expenses under the Certificate.

762 F.Supp. at 594. North River argues that the above language supports its assertion that the ADR opinion settled, once and for all, the question of whether the underlying policies require North River to pay defense costs in excess of policy limits.

The Second Circuit in *Unigard II*, however, has implicitly rejected this argument. As mentioned earlier, the Court of Appeals noted that "[t]he fact that North River was compelled by arbitration to pay the disputed expenses does not alter the terms of the bargained-for [reinsurance] agreement." *Unigard II*, at 1071. Therefore, the ADR opinion, even if it did construe the Owens–Corning policies as written, does not settle the coverage issues under the reinsurance certificates.

Nor is this Court convinced, as the cited language of *Unigard I* implies, that the ADR opinion relied on the underlying policies as written. In *Unigard I*, the district court concluded, among other things, that the reinsurer, Unigard, was obligated under its reinsurance certificate to pay defense costs to the reinsured, North River, in excess of reinsurance certificate limits. In so holding, that court distinguished the Second Circuit decision in *Bellefonte Reins. Co. v. Aetna Cas. & Sur. Co.*, 903 F.2d 910 (2d Cir.1990), which had concluded that the reinsurer in that case was not obligated to pay defense costs in excess of the certificate limits.

North River notes that the *Unigard I* decision involves XS–3672, identical in its form language to the Owens–Corning–North River underlying policies at issue here, and refers to the July 1989 ADR opinion of Judge Hermansdorfer. However, the *Unigard I* opinion does not analyze the text of the ADR opinion to find support for its characterization. Nor did that court address many of the key issues posed here, including the material effect of Section XI of the Wellington Agreement, North River's failure to follow the mandated scheduling procedures of Appendix D, and North River's duty to act with the utmost good faith toward CIGNA Re.

North River argues that the Court should give deference to the *Unigard I* analysis, citing *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.*, 680 F.Supp. 159, 163 (D.N.J.1988). However, the cited portion of that opinion concerns a motion for reconsideration by one district judge of an opinion issued by another district judge in the same case. *Unigard I* was decided by a trial court judge in a different case brought in a different circuit, hardly the situation which applied in *Florham Park*.

Therefore, since North River and CIGNA Re understood the Owens Corning policies to exclude defense costs, they both consequently understood them to be excluded from coverage under the re-insurance certificates. There is no dispute between North River and CIGNA Re about their understanding of the consequences of the "following form" clause in the re-insurance certificates. This result is not altered because North River was obligated to arbitrate its liability to Owens Corning under the provisions of the Wellington Agreement. In imposing liability on North River for defense costs under its policies with Owens Corning, Judge Hermansdorfer construed the language of the policies as affected and informed by the provisions of the Wellington Agreement, to which CIGNA Re was not a party.

### (C) Waiver and Estoppel

North River makes various arguments of waiver and estoppel, asserting that CIGNA Re through its conduct has lost its right to contest the payment of defense costs. For the following reasons, the Court rejects these arguments.

### (1) Failure to Raise Defenses in a Timely Fashion

North River argues that CIGNA Re "failed to respond" to North River's bills for defense costs until December 1990, more than a year after those bills were sent. (North River Support Brief at 33.) North River argues that CIGNA Re's December 1990 letter did not properly preserve any of its presently asserted defenses. (Id.)

North River uses the phrase "failed to respond" too restrictively. As mentioned earlier, during both August and October 1990, James P. Jones of CIGNA Re visited Crum & Forster's environmental claims unit and reviewed the files relevant to those bills. Jones specifically requested, prior to the December 1990 letter, additional information from North River concerning the claims at issue. (See, e.g., Appendix 24 to CIGNA Re's Opposition Brief.)

The Court notes that it is important to distinguish between CIGNA Re's coverage argument, i.e., that its certificates do not cover defense costs, from its bad faith defense, i.e., that North River's grossly negligent and unbusinesslike conduct excuses CIGNA Re from paying for what might otherwise be covered under the certificates. Waiver does not apply to the coverage argument. As one insurance treatise explains:

> Waiver and estoppel differ in that where the loss is not covered by the policy, there is nothing to waive, yet the insurer may be estopped by his conduct from asserting lack of coverage.

Barry R. Ostrager & Thomas R. Newman, *Insurance Coverage Disputes,* § 2.06 at 56 (5th Ed.1992) (citations omitted.)

Nor does estoppel apply to the coverage argument. As North River has not alleged any prejudice as a result of any purported delay in CIGNA Re's asserting lack of coverage, CIGNA Re cannot be estopped from making such an assertion. *See Western World Ins. Co. v. Jean & Benny's Restaurant, Inc.,* 69 A.D.2d 260, 419 N.Y.S.2d 163, 165 (Sup.Ct.App.Div.1979) *appeal dismissed* 48 N.Y.2d 653, 421 N.Y.S.2d 202, 396 N.E.2d 485 (N.Y.1979) (estoppel against asserting non-coverage applies only where insured proves prejudice as a result of unreasonable delay).

Furthermore, neither waiver nor estoppel applies to CIGNA Re's bad faith defense. A key element of this defense involves allegations that North River acted with gross negligence in certain of its actions in respect to the Wellington Agreement. Given CIGNA Re's lack of knowledge of this conduct until after this suit was filed, North River can hardly assert the doctrine of waiver, which by definition involves "a voluntary and intentional relinquishment of a known right with full knowledge of the facts upon which the existence of the right depends." *Insurance Coverage Disputes,* § 2.06 at 56. (citations omitted.) Nor may it assert the doctrine of estoppel, having failed to produce evidence of prejudice.

### (2) Admission of Coverage

North River's assertion that Jones "admitted" in a November 1990 memo (Wayland Affidavit, Exhibit O) that the ADR opinion

expressly held that the Owens–Corning policies required North River to pay defense costs also lacks merit. Jones, who is not a lawyer, states in his affidavit that his characterization of the ADR opinion was based in large measure on the statements of North River representatives he met during the October 1990 visit to the Crum & Forster claims unit. (CIGNA Re's Opposition Brief, Appendix 42.) In addition, Jones at the time had read the opinion quickly once and was still seeking a complete copy from North River. (*Id.*)

### (3) Failure to Exercise Right to Associate

■ North River argues that CIGNA RE, by failing to exercise its right to associate in the ADR proceedings, may not now assert that North River failed to keep it adequately informed concerning the ADR proceedings. The Court finds this argument also lacks merit, because it concludes that North River never properly gave CIGNA Re the opportunity to associate.

Each of the four certificates at issue here contains a "Right to Associate" clause. The language in each of the four does not materially differ from that of the other three. For example, Paragraph 3 of FRC–016186 provides that "[w]hile [CIGNA Re] does not undertake to investigate or defend claims or suits it shall nevertheless have the right and be given the opportunity to associate with [North River] and its representatives at its own expense in the defense and control of any claim, suit or proceeding involving this reinsurance, with the full cooperation of [North River]." (CIGNA Re's Support Brief, Appendix 5B.)

North River did not give CIGNA Re a proper opportunity to associate in the ADR proceedings. It did not alert its reinsurers to the pending ADR mediation until September 1988, when it issued a letter to "Reinsurers at Interest." That letter, however, was mailed approximately eight months after George B. Luteran had written a memo to the file indicating that North River had already decided to reject any settlement and proceed to arbitration. (*Id.,* Exhibit 13.)

The September 1988 letter also states that Dean Feerick, the mediator, had "expressed the view that [ ] a compromise will require the payment of some portion of Owens–Corning's allocated expenses (i.e., defense expenses) in addition to policy limits." (*Id.,* Exhibit 14.) However, Crum & Forster vice-president for environmental claims Roger L. Prickett testified that Dean Feerick had, in fact, recommended a settlement designing the policies as form "H," paying defense costs but only within policy limits. (*Id.,* Exhibit 12, at 295.) Had CIGNA Re been told that Dean Feerick had suggested a settlement of paying defense costs within policy limits, it might have been more interested in associating with North River in the mediation phase.

■ Even if North River had given CIGNA Re an adequate opportunity to exercise its right to associate, CIGNA Re would still be permitted to assert both its lack of coverage argument and its the defense of bad faith. As mentioned earlier, an insurer cannot waive the right to assert a lack of coverage, but may be estopped if the other party has been prejudiced by the insurer's delay. North River has shown no prejudice here. In addition, the bad faith defense does not arise from the "right to associate clause" of the reinsurance certificates. The defense is a right arising from the generally implied contractual duty of good faith and fair dealing. *See Unigard II,* at 1065–66.

### (4) Payment of Defense Costs Under Other Contracts

■ Lastly, North River notes that CIGNA Re has already paid North River's Owens–Corning defense costs bills under reinsurance contracts not at issue here, involving the Newark Re and Carpenter Management Corp. ["Carpenter"] pools. These payments, North River asserts, "constitute an admission that North River's Owens–Corning defense cost bills are properly payable by all of its reinsurers." (North River's Support Brief at 37.)

North River argues that the payments under the Newark Re and Carpenter pools indicate CIGNA Re's understanding that the four reinsurance contracts at issue here also paid defense costs in excess of policy and

certificate limits. (*Id.*) As CIGNA Re points out, however, (CIGNA Re's Opposition Brief at 26–27) those payments were made under two materially different contractual arrangements than the four reinsurance contracts at issue here.

The Newark Re pool involved the now defunct Newark Re Management Corp. which issued several reinsurance treaties to Crum & Forster. CIGNA Re's relationship to the Newark Re pool was not as a direct participant, but as a retrocessionaire of certain former Newark Re pool members, such as Horace Mann, a CIGNA Re affiliate.

The Newark Re treaties have materially broader language than that of the four facultative certificates at issue here. The treaties provide coverage "on the same terms ... *and to the same modifications, alterations and cancelments as of the respective [underlying] Policies* ..." (*See, e.g., id.,* Appendix 46, Treaty 735, at p. 3.) (emphasis added.) The certificates at issue, on the other hand, specifically provide that the certificate terms shall not be waived or changed except by an endorsement executed by a duly authorized CIGNA Re representative. (*See, e.g.,* CIGNA Re's Support Brief, Appendix 5A.)

The Carpenter pool, of which CIGNA Re participated as a pool member, was governed by a management contract. (*Id.,* Appendix 43.) Under this pool arrangement, each reinsurer in the pool agreed to accept a specified portion of the risk, which in this case was underwritten by an intermediary, Carpenter. The management contract gave Carpenter "full power and authority" to pay "losses and loss expenses on reinsurance assumed hereunder." (*Id.,* at p. 7.)

CIGNA Re has also presented evidence that it acted in accordance with the custom and practice of the reinsurance industry when it routinely paid the claims approved by Carpenter whether it agreed with the basis for payment or not. (*Id.,* Appendix 4, Robert M. Huggins Affidavit, at 1–2.) In keeping with this recognition of Carpenter's "full power and authority" to settle claims, Carpenter billed CIGNA Re through monthly "bordereaux" statements which did not include detailed information about each claim. (*Id.,* at 2.)

CIGNA Re recognizes that the Carpenter management contract is substantially similar to the TPF & C management contract, one of the four certificates at issue here. (CIGNA Re's Opposition Brief at 28 n. 32.) However, it has submitted uncontradicted evidence that both CIGNA Re and TPF & C, by well-established course of dealing, had chosen to allow CIGNA Re to make its own claims determinations. (*See id.,* Appendix 4, Huggins Affidavit, at 2–3; Appendix 27, Jones Affidavit at 274–75; Appendix 45, CIGNA Document Nos. 9483–84, 9562–64, 9566–70, 9592–93, 9615 and 9619.)

For example, a memo by Jones dated March 3, 1983 characterized TPF & C's role as that of

> ... middlemen, communicating and updating loss information obtained from the [reinsured]. All requests for specific information from a reinsurer are passed on to the [reinsured] for their response. [sic] I did not see any instances where they initiated or exercised any independent claims judgement or raised any questions on their own. ...

(*Id.,* Appendix 45, CIGNA Document No. 9484.)

### 2. North River's Motion

North River also moves for summary judgment, asserting that as a matter of law CIGNA Re must reimburse it for the defense costs under the Owens–Corning policies. For the reasons discussed above, the Court has already rejected North River's contentions that CIGNA Re is bound to pay those costs, either through the "following form" or the "follow the fortunes" clause, or the doctrines of waiver and estoppel. Therefore, the Court denies North River's summary judgment motion.

### III. CONCLUSION

For the reasons discussed above, the Court grants CIGNA Re's motion for summary judgment and denies North River's summary judgment motion. An appropriate order follows.

ORDER

This matter having come before the Court on cross motions by the plaintiff, North River Insurance Co., ("North River") and the defendant, CIGNA Reinsurance Co., for summary judgment under Fed.R.Civ.P. 56; and

The Court having reviewed the papers submitted by the parties and having heard oral argument on June 14, 1993; and

For the reasons set forth in the Court's opinion filed this date; and

For good cause shown;

It is on this 20th day of September, 1993 ORDERED that:

(1) CIGNA Re's rule 56 motion for summary judgment is hereby GRANTED; and

(2) North River's rule 56 motion for summary judgment is hereby DENIED.